Donald K. NORTON, Appellant,

v.

STATE of Indiana, Appellee.

No. 377S185.

Supreme Court of Indiana.

Aug. 4, 1980.

E. Kent Moore, Moore, Sandy, Moore & Deets, Lafayette, for appellant.

Theodore L. Sendak, Atty. Gen., Terry G. Duga, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-appellant Donald K. Norton was charged in Parke Circuit Court with two counts of first degree murder. The charging instrument alleged that Norton was an accessory before the fact of two murders for hire under Ind. Code §§ 35–1–29–1 and 35–13–4–1(b)(6)(ii) (Burns 1975). These charges arose out of the stabbing deaths of Norton's wife and four year old son on January 9, 1976. After a change of venue to the Benton Circuit Court, appellant Norton was tried to a jury and convicted on both counts. The trial court sentenced appellant to die by electrocution.

Appellant raises thirty-three questions for our consideration, which may be categorized into the following twenty-three issues:

(1) two issues relating to the trial of this cause as a death penalty case; (2)whether the trial court erred in denying appellant Norton's motion to dismiss; (3) whether the trial court committed error concerning defense counsel's wish to depose Benjamin Woody, one of the State's witnesses; (4) whether Benjamin Woody should have been allowed to give his reasons for testifying; (5) whether two out-of-court statements made by Woody should have been admitted during redirect examination of Woody; (6) whether the trial court improperly limited the cross-examination of Woody and another witness; (7) whether the prosecution should have been allowed to corroborate Woody's testimony during its case-in-chief; (8) whether witness Steve Jones should have been allowed to testify as to his subjective thought processes; (9) whether the trial court erred in admitting testimony and exhibits concerning the details of a proposed robbery plan; (10) whether the trial court erred in admitting evidence of appellant Norton's alleged immoral conduct; (11) whether witness Gary Cooper should have been allowed to give his opinion regarding Norton's behavior at the scene of the crime; (12) whether the trial court erred in admitting evidence concerning the amount of insurance coverage Norton had on the lives of his wife and child; (13) whether the trial court erred in allowing witness Lloyd Heck to testify as a homicide expert; (14) whether the trial court erroneously permitted the prosecutor's repeated use of leading questions; (15) whether the prosecutor was permitted to conduct redirect examination which was beyond the scope of cross-examination; (16) whether the trial court erroneously limited cross-examination in the manner of showing witnesses' prior inconsistent statements; (17) whether the prosecution was allowed to present improper rebuttal evidence; (18) whether the prosecutor engaged in misconduct; (19) whether the trial court erred by refusing to sequester the jury during the trial; (20) whether the trial court should have declared a mistrial due to alleged premature deliberations by the jury; (21) whether the trial court erred in denying appellant's motion for a directed verdict; (22) whether the trial court erred in giving certain final instructions tendered by the State; and (23) whether the trial court erred in refusing to give certain final instructions tendered by appellant Norton.

On January 9, 1976, Benjamin Woody entered the Norton home and killed Christine Norton and four year-old Bret Norton by repeatedly stabbing them with a knife. Appellant Norton had extensively discussed and counselled with Woody concerning these killings on at least three occasions before this date. Norton told Woody that Bret Norton had leukemia and was certain to die, and that Christine Norton was not aware of this fact. Norton also told Woody that he was afraid Christine Norton would commit suicide if Bret Norton were to die. Norton wanted Woody to kill them to "put them out of their misery." The autopsy of Bret Norton revealed no evidence of leukemia. Norton promised to pay Woody $57,-000 if he would commit these murders, and apparently made thinly veiled threats to Woody about the future safety of Woody's family if Woody refused to assist Norton.

The evidence revealed that Norton planned their course of conduct, including the rental of a car and the obtaining and disposing of the clothing Woody wore and the weapon he used. A short time before the killings, Norton and Woody travelled to Lincoln, Illinois. There they visited Norton's girlfriend, Dixie Koester, and obtained from her mobile home a garbage bag containing several articles to be used in the crimes. One day before the killings, Norton took Woody to the Norton home. Christine and Bret Norton were not home at that time, and Norton proceeded to show Woody the layout of the house, including the bedrooms in which Christine and Bret would be sleeping. Norton also gave Woody a copy of the key to the house and showed Woody which door to use. To provide an apparent motive for the crimes, Norton encouraged Woody to perform intercourse on Christine Norton after he killed her.

After the killings, Norton indicated to Steve Jones that he knew who had killed Christine and Bret and that he would pay

Jones $10,000 to kill that person. Norton apparently also mentioned Woody by name. The evidence further showed that Norton was formerly employed by the Prudential Life Insurance Company. During the course of his employment, Norton purchased several life and health insurance policies on Christine and Bret Norton. These policies were scheduled to pay $604,000 upon the deaths of Christine and Bret.

Woody turned himself in to police on January 17, 1976. Shortly after his arrest, he gave police a written statement concerning his involvement in this incident. A few days later, Woody gave police a second written statement in which he implicated Norton and gave greater details of the crimes. Woody also changed a number of facts in his second statement. Norton was arrested on January 20, 1976.

### I.

■ Appellant claims the trial court erred in not holding the death penalty portion of the murder statute unconstitutional. He also asserts that the court erred by excluding potential jurors due to their general objections to capital punishment. Subsequent to the trial of this case, we held the death penalty portion of the murder statute unconstitutional in *French v. State*, (1977) 266 Ind. 276, 362 N.E.2d 834. Thus, it is clear that appellant cannot receive the death penalty for these convictions. However, this does not entitle him to a reversal of these convictions. We have held that, in cases where a death penalty sentence was imposed under the unconstitutional statute, the death sentence would be vacated and the case remanded with instructions to impose life sentences for each conviction. *Gaddis v. State*, (1977) 267 Ind. 100, 108–09, 368 N.E.2d 244, 249–50; *Fair v. State*, (1977) 266 Ind. 380, 393–94, 364 N.E.2d 1007, 1014. This will be the result in this case.

■ Appellant's argument concerning the exclusion of potential jurors due to their objections to the death penalty is based on *Witherspoon v. Illinois*, (1968) 391 U.S. 510, 515, 88 S.Ct. 1770, 1773, 20 L.Ed.2d 776. We were presented with a similar

argument in *Frith v. State*, (1975) 263 Ind. 100, 325 N.E.2d 186. We held in *Frith* that, unless appellant could show that jurors who were not opposed to the death penalty "tend to favor the prosecution in the determination of guilt or innocence," the issue would be considered moot, where a death sentence will not, in any event, be imposed. Appellant has made no such showing in this case, and the issue is, therefore, moot.

### II.

■ Appellant Norton next claims the trial court should have granted his pretrial motion to dismiss. He claims that each count of the charging instrument actually charged him with two crimes, accessory to murder for hire and murder for hire. We do not accept appellant's interpretation of the language of the information. The pertinent language of the information reads as follows:

"On or about the 9th day of January, 1976, . . . Donald K. Norton did unlawfully and feloniously counsel, encourage, hire, and procure Benjamin Paul Woody to commit a felony, to-wit: to kill and murder for hire, one Christine Ann Norton, by unlawfully, feloniously, purposely, and with premeditated malice, by striking and stabbing with a sharp instrument, to-wit: a knife, the body of the said Christine Ann Norton, thereby inflicting mortal wounds, causing her death; that thereafter the said Benjamin Paul Woody did on or about the 10th day of January, 1976, . . . kill and murder the said Christine Ann Norton, by unlawfully, feloniously, purposely and with premeditated malice by striking and stabbing with a sharp instrument, to-wit: a knife, the body of the said Christine Ann Norton, thereby inflicting mortal wounds, causing her death.
. . . ."

Record at 109. The second count of the information alleged the murder of Bret Norton in identical language. The accessory liability statute which was in effect at the time these crimes were committed, Ind. Code § 35–1–29–1 (Burns 1975), provided:

"*Accessory before the fact.*—Every person who shall aid or abet in the commission of a felony, or who shall counsel, encourage, hire, command, or otherwise procure a felony to be committed, may be charged by indictment, or information, tried and convicted in the same manner as if he were a principal, either before or after the principal offender is charged, indicted or convicted; and, upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal."

Further, the relevant portion of the homicide statute which was in effect at the time these crimes were committed, Ind. Code § 35–13–4–1 (Burns 1975), provided:

"(b) Whoever perpetrates any of the following acts is guilty of murder in the first degree . . .:

. . . . .

(6) Killing a human being purposely and with premeditated malice:

. . . . .

(ii) by a person hired to kill;
. . ."

Clearly, Norton was charged with being an accessory. However, it is equally clear that the information did not allege that he was the principal in these murders. The language of the information specifically alleges that Norton unlawfully and feloniously counselled, encouraged, hired and procured *Benjamin Woody* to commit murder for hire, and that *Woody* thereafter did commit murder for hire. The information does not allege that Norton committed murder for hire by actually performing the killings himself. The information does not, then, charge Norton with being both an accessory and a principal in a murder for hire. Obviously, the prosecution's theory throughout the case was that Norton had hired, encouraged and counselled Woody to commit these murders, and that Woody had performed the killings. In fact, prior to appellant's arrest, Woody admitted stabbing the two victims. We do not believe the language of the instrument was duplicitous or so misled appellant that he was entitled to have the information dismissed. *See Heflin v. State*, (1977) 267 Ind. 427, 370 N.E.2d 895; *Carmon v. State*, (1976) 265 Ind. 1, 349 N.E.2d 167. This issue is without merit.

### III.

■ Appellant next urges he was improperly denied an opportunity to depose Benjamin Woody. It appears from the record that on August 9, 1976, *voir dire* of the prospective jurors began. On that date, appellant filed a motion to take the deposition of Benjamin Woody. This motion asked the court for an order directing Woody to appear for the deposition at 4:30 p. m., on August 10. Appellant's motion also alleged that Woody gave a "complete statement" to the prosecutor on August 3, but that defense counsel had not learned of this statement until the day the motion was filed, August 9. Appellant also filed on August 9 a "Notice to Take Deposition Orally." This notice informed the prosecution of the deposition of Woody. The time originally listed was 4:30 p. m., August 10. However, this time was changed by hand to read "11:30 a. m." The trial court granted appellant's motion to depose Woody, subject to the proviso that the trial would not be continued for the purpose of deposing Woody. The record further reveals that on August 10, prior to the continuation of *voir dire* and the selection of the jury, appellant moved for a "continuance of Deposition of Benjamin Paul Woody, heretofore authorized." Record at 157. It is not clear whether defense counsel did, in fact, depose Woody on August 10. The trial court denied this motion. Appellant now argues the trial court abused its discretion in refusing to continue the trial and thereby "denying" him his "right" to depose Woody.

This contention is without merit. The record does not reveal the grounds alleged in the motion for continuance; nor does it contain the trial court's reasons for denying this continuance. Appellant knew on August 9 that the trial court would permit the taking of the deposition, but would not

continue the trial for this purpose. There is, moreover, no showing that counsel did not depose Woody on August 10, at either 11:30 a. m. or 4:30 p. m., as the order and motion indicated. Further, the record reveals that Woody did not testify until August 12. Appellant does not allege or show that he was unable to complete the deposition after court adjourned on August 10, or at any time outside the court session on August 11. Thus, appellant has failed to show an abuse of discretion in the trial court's refusal to grant appellant's motion for continuance. *See Johnson v. State*, (1971) 255 Ind. 589, 266 N.E.2d 57; *State ex rel. Rooney v. Lake Circuit Court*, (1957) 236 Ind. 345, 140 N.E.2d 217. *See generally State ex rel. Grammer v. Tippecanoe Circuit Court*, (1978) Ind., 377 N.E.2d 1359.

### IV.

Appellant Norton next claims the trial court erred when it permitted Benjamin Woody to give his subjective reasons for testifying. Appellant asserts this testimony was irrelevant and prejudicial to him. Woody testified on direct examination that, subsequent to the killings, he "went through a week of hell." He also stated that his wife was scared and concerned for their well-being. He testified that he also turned himself in to police because he heard Bret Norton did not have leukemia and because he heard Norton had $600,000 worth of insurance.

■ Our relevancy standard concerns whether the evidence in question has a tendency to prove a disputed fact in issue. We have stated that this tendency need be only slight to justify admission of the evidence. *Wilson v. State*, (1978) 268 Ind. 112, 116, 374 N.E.2d 45, 47. Woody acknowledged on cross-examination that he was testifying partly to relieve himself of guilt, take his punishment, and "get it over with." Defense counsel thoroughly covered this area on cross-examination. Appellant now claims Woody's testimony was unduly prejudicial because Woody indicated he was in fear of Norton for himself and his family. Initially, however, we note that the testimony which was objected to did not directly connect Woody with appellant. Thus, it could not have been as prejudicial to appellant as he now claims. Further, Woody earlier testified without objection as to Norton's threats against him and his family and his fear of Norton. Moreover, this testimony was relevant to show the alleged connection between Norton and Woody. We think this evidence was probative on the question of whether Woody was hired by Norton or was acting alone when he killed Christine and Bret Norton. Thus, we find no error in admitting this testimony into evidence.

### V.

■ Appellant argues the trial court erred when it permitted the prosecution to have Woody read into evidence his two written out-of-court statements on redirect examination. These statements were given to police within a few days after Woody turned himself in. Appellant apparently claims these statements were hearsay in nature and their admission denied him his right to confront witnesses against him.

Woody testified at length during the prosecution's case-in-chief. Also, he was extensively cross-examined regarding the content of these statements and the discrepancies between them. The result of this cross-examination was a potentially confused picture of the respective involvement of Woody and Norton in the killings, what Woody believed the truth to be, and the content of and circumstances surrounding Woody's out-of-court statements. We think allowing these statements to be read to the jury facilitated a better understanding and evaluation of the facts of the case and Woody's credibility. *New York Cent. R. Co. v. Wyatt*, (1962) 135 Ind.App. 205, 184 N.E.2d 657, *trans. denied*, (1963) 244 Ind. 373, 193 N.E.2d 63. In addition, Woody was available for full recross-examination after these statements were read. We find no denial of the right of confrontation and no error in admitting these statements into evidence on redirect examination. *Flewallen v. State*, (1977) 267 Ind. 90, 94, 368

N.E.2d 239, 241; *Patterson v. State*, (1976) 263 Ind. 55, 58, 324 N.E.2d 482, 484–85. *See Elgin, J. & E. Ry. Co. v. Collins*, (1970) 147 Ind.App. 343, 260 N.E.2d 810.

## VI.

Appellant Norton next asserts he was improperly limited in his cross-examination of Benjamin Woody and Steve Jones. He claims he was unable to cross-examine Woody as to his prior inconsistent statements and his use of drugs. Appellant also argues he was not permitted to cross-examine Jones concerning previous false accusations made by Jones and Jones' alleged use of marijuana.

These assertions simply find no support in the record. Counsel told the trial court he was not attempting to impeach Woody concerning his prior statements, but counsel now argues the court's rulings resulted in an "inability" to impeach Woody. In any event, we have been directed to no instance in which counsel was prevented from or unable to question Woody concerning the matters he wished. The trial court merely directed the manner in which Woody's prior inconsistent statements were to be pursued and brought out. Appellant makes no showing that the court's proposed method would have been any less effective or efficient or would have otherwise prevented him from fully impeaching Woody.

This is also true with regard to testimony concerning Woody's use of drugs. Appellant attempted to show these facts on cross-examination of Woody by questioning him concerning the hearsay statements of a doctor who had examined Woody. This would have been clearly improper, and, again, appellant has not shown that he was unable to fully examine this subject using other equally effective methods.

Concerning witness Steve Jones, appellant claims he was prevented from bringing out two alleged facts which he claims would have affected Jones' credibility. Norton argues he was unable to attempt to show that Jones had made a prior false accusation against a third person concerning an unrelated crime. The trial court concluded this was a collateral matter, and would not permit this line of questioning unless counsel could connect it to the case at bar. We note that appellant did elicit the fact that Jones had previously accused a third person of participation in the murders of Christine and Bret Norton. Appellant also claims he was not able to show that Jones knew that Norton was aware that Jones had allegedly used marijuana. However, counsel asked Jones if it were not true that Norton knew of certain matters that would jeopardize Jones' teaching career. Jones replied in the negative. When counsel attempted to pursue these allegations further, the prosecutor objected, and the trial court held that counsel was bound by the witness' previous negative answer regarding this general subject.

■ The conduct and scope of cross-examination is left largely to the trial court's discretion. *Ashbaugh v. State*, (1980) Ind., 400 N.E.2d 767, 772; *Gutierrez v. State*, (1979) Ind., 395 N.E.2d 218, 223. Appellant was permitted to cross-examine these witnesses extensively in an attempt to adversely affect their credibility. We do not believe the isolated instances to which we are referred reveal a denial of the right to cross-examine witnesses or an abuse of discretion.

## VII.

■ Norton argues the trial court erred when it permitted the State to elicit testimony concerning two prior consistent statements made by Benjamin Woody. Witnesses Terry Cox and David Peterson testified during the State's case-in-chief that Woody had told them that Norton was attempting to hire Woody to commit these murders. Appellant Norton now claims this testimony was improper because it contained hearsay, and because it corroborated Woody's testimony when Woody had not been impeached.

Both of these arguments are without merit. Cox and Peterson testified as to conversations each had with Woody. All three men were available for cross-examination, and all were, in fact, cross-exam-

ined. Therefore, just as in Issue V, *supra*, appellant's hearsay argument must fail. *Flewallen v. State, supra; Patterson v. State, supra.* Appellant acknowledged that, once a witness has been impeached, his prior consistent statements may be admissible. *Hobbs v. State,* (1892) 133 Ind. 404, 407, 32 N.E. 1019, 1020. We note that, in fact, Woody was impeached prior to the admission of these statements into evidence. We hold the trial court did not err in admitting this testimony.

## VIII.

Appellant Norton next alleges that Steve Jones was improperly allowed to testify as to his "subjective thought process." It appears that Jones recited certain statements made to him by Norton. The prosecutor asked Jones whether he believed what Norton had said, and appellant's objections were overruled. Appellant now asserts that Jones was thus permitted to draw conclusions in his testimony. Norton told Jones that Norton and Woody had committed a triple murder in Ohio. Norton then told Jones that Woody had to be killed. Approximately one week later, on January 2, 1976, Norton raised the matter again to Jones and offered Jones $10,000 to kill Woody, saying: "It may be in a week; it may be in two weeks, but I know it's going to have to be done." This occurred approximately one week before the killings here. When the prosecutor asked Jones if he believed Norton to be serious, Jones said he did not know. A few days after the murders, Norton increased his offer to Jones of payment for killing Woody to $50,000. He told Jones that he would be receiving insurance money. Jones said on direct examination that he did believe Norton on that occasion.

■ We find no error in the admission of this testimony in this case. *See Newman v. Newman,* (1943) 221 Ind. 432, 439, 48 N.E.2d 455, 458. *See also Guardiola v. State,* (1978) 268 Ind. 404, 408, 375 N.E.2d 1105, 1108; *M. Seidman, The Law of Evidence in Indiana,* pp. 18–20 (1977). We note that Jones was permitted without objection on other occa-

sions to testify as to his reactions to some of Norton's statements. Jones was asked if he believed Norton's story about the murders in Ohio. Jones replied that he did not believe it. Jones' testimony also revealed that he and Norton discussed the murders of Christine and Bret. Jones testified without objection that he believed Norton knew more about the murders than he was telling Jones. The court committed no error on this issue.

## IX.

■ Appellant Norton next argues the trial court erred when it permitted exhibits and testimony concerning an alleged robbery plan to be placed in evidence. Benjamin Woody testified that he, Norton and others had obtained certain articles in anticipation of robbing a poker game. Several of these items were, in fact, used in the commission of the murders in question. Appellant contends the evidence of the robbery plan was unduly prejudicial to him and should not have been admitted.

The trial court did not err in admitting this testimony and these exhibits. Appellant correctly states that evidence of separate crimes is not admissible, unless such evidence shows intent, purpose, motive, identification, or a common scheme or plan with respect to the charged crime. *Grooms v. State,* (1978) Ind., 379 N.E.2d 458, 463; *Willis v. State,* (1978) 268 Ind. 269, 272, 374 N.E.2d 520, 522; *Pierce v. State,* (1977) 267 Ind. 240, 248, 369 N.E.2d 617, 621. However, this rule did not require the exclusion of this evidence in this case. First, apparently the proposed robbery was never committed. We question, then, whether a separate "crime" was committed which would call into operation the rule noted above. Second, even assuming this rule was applicable, the exhibits and testimony complained of showed the origin of some of the items used in the charged crimes, and put the obtaining of these items into the context of a plan involving Norton and Woody, by showing Norton's knowledge of the existence of the items used. This evidence, then, drew a direct connection between ap-

pellant Norton and the crimes with which he was charged here, and therefore was properly admitted. *Porter v. State*, (1979) Ind., 397 N.E.2d 269, 272; *Grooms v. State, supra.*

### X.

█ Appellant next claims the trial court erroneously permitted the prosecutor to ask a defense witness about appellant Norton's alleged immoral conduct. Witness Donald Pratt testified about a conversation he had with Steve Jones and appellant Norton, apparently in December of 1974. Pratt testified on direct examination that Jones boasted on that occasion about having had sexual intercourse with some of his students. On cross-examination, the prosecutor asked Pratt if Norton ever mentioned that he was "keeping a girl in an apartment" in Illinois. Appellant now claims this was an improper question, not probative of any material issue, and designed only to arouse the prejudices of the jury. Therefore, he argues, a mistrial should have been granted.

This argument is without merit for three reasons. First, appellant's objection at trial was that this matter was beyond the scope of direct examination. No mention was made at trial on the grounds appellant asserts before us on appeal. Therefore, the issue has been waived. *Bell v. State*, (1977) 267 Ind. 1, 6, 366 N.E.2d 1156, 1159. Second, even if we overlook *this* waiver, appellant waived this issue in a second respect. Counsel notes that a mistrial was requested when this evidence was admitted. However, the motion for mistrial was based on a comment made by the prosecutor concerning an alleged violation of a pretrial discovery order. This, then, was a second occasion on which appellant failed to raise this issue before the trial court. Counsel never asked to have the testimony in question struck, and never requested that the jury be admonished to disregard this testimony. *See Goodpaster v. State*, (1980) Ind., 402 N.E.2d 1239, 1241. Third, we note that Benjamin Woody testified without objection and in much greater detail regarding

Norton's relationship with the girl in the apartment in Illinois. Thus, Norton can show no harm from this portion of Donald Pratt's testimony.

█ Appellant claims to have preserved this issue by allegedly raising the present objections in a pretrial motion in limine. However, as we noted in *Crosson v. State*, (1978) 268 Ind. 511, 515, 376 N.E.2d 1136, 1139–40:

> "It is true that motions in limine are used before trial as protective order against *prejudicial* questions and statements which might arise during trial.

> . . . . .

> However, it must be remembered that it is not the office of a motion in limine to obtain a final ruling upon the ultimate admissibility of ·evidence. Rather, the purpose of the motion is to protect the proponent of potentially prejudicial matter from displaying it to the jury, making statements about it to the jury, or presenting it to the jury in any manner until the trial court has ruled upon its admissibility in the context of the trial itself." (emphasis in original)

Thus, even if appellant did raise a question concerning the alleged prejudicial nature of this evidence in a pretrial motion in limine, he has not preserved the issue for review. The filing of an unsuccessful motion in limine does not relieve the movant of his obligation to file timely objections during trial to the introduction of evidence he considers inadmissible. *See Gilliam v. State*, (1978) Ind., 383 N.E.2d 297. *See also Inman v. State*, (1979) Ind., 393 N.E.2d 767; *O'Conner v. State*, (1980) Ind., 399 N.E.2d 364. Thus, as we explained above, appellant has waived this issue.

### XI.

█ Appellant argues the trial court erroneously permitted a police officer to give his opinion regarding appellant's behavior when he was questioned at the scene of the killings. Officer Cooper testified on direct examination by the prosecutor that Norton initially acted upset and angry, but seemed to quickly calm down. On cross-examina-

tion, defense counsel elicited testimony from Cooper indicating that Cooper had told the grand jury only that Norton appeared emotional and upset. On redirect examination, the prosecutor attempted to further discuss Norton's appearance. Cooper was permitted to testify again that Norton appeared to him to be emotionally upset, but that Norton was able to contain his emotions to some degree. Appellant now claims this was improper because it allowed Cooper to give a subjective opinion.

We think this testimony was properly admitted. The witness was merely describing how Norton appeared to him. *Guardiola v. State*, (1978) 268 Ind. 404, 408, 375 N.E.2d 1105, 1108; *Franks v. State*, (1975) 262 Ind. 649, 658, 323 N.E.2d 221, 226. *Cf. Strickland v. State*, (1977) 265 Ind. 664, 359 N.E.2d 244. There is no error here.

### XII.

■ Appellant next contends the trial court erred when it allowed in evidence an opinion regarding the amount of insurance Norton had on his wife and child. Witness Ross Lock testified that he was the manager of the Terre Haute district office of the Prudential Life Insurance Company. In this capacity, he supervised the overall operation of the Terre Haute district. Lock testified that appellant Norton worked for him from December, 1974, to October, 1975. During that period, Norton wrote several life insurance policies on his wife and son. Lock identified copies of these policies and explained their coverage. The total value of these policies, including coverage for accidental death, was $604,000. Lock testified on direct examination that he believed this to be an unusual amount of insurance for an employee in Norton's position to carry. Appellant objected to this testimony, arguing that Lock was improperly expressing an opinion on an irrelevant and immaterial matter.

We believe the court did not err in admitting this testimony. Whether Lock was an insurance expert, qualified to give an opinion on the amount of insurance Norton had, was a question for the trial court's discre-

tion. *Page v. State*, (1979) Ind., 395 N.E.2d 235, 238; *Reid v. State*, (1978) 267 Ind. 555, 560, 372 N.E.2d 1149, 1152. The extent of the witness' knowledge of such matters affects the weight of the witness' testimony. *Id.* The weight to be given this testimony was, of course, for the jury to determine. We think there was sufficient evidence from which the court could find Lock qualified to give an opinion regarding Norton's insurance policies. We also note that Lock's opinion on this issue was not challenged on cross-examination. Further, we think this evidence was relevant to show appellant's motive. *See Anglin v. State*, (1979) 244 Ga. 1, 257 S.E.2d 513; *State v. Hartfield*, (1979) S.C., 252 S.E.2d 139; *Dyas v. State*, (1976) 260 Ark. 303, 539 S.W.2d 251. *See generally Kallas v. State*, (1949) 227 Ind. 103, 83 N.E.2d 769. This evidence was properly admitted.

### XIII.

■ Norton claims the trial court erred when it concluded that witness Lloyd Heck was a homicide expert and permitted him to express an opinion. Witness Heck was the State Police officer in charge of the investigation in this case. He testified that, at the time of the trial, he had been a police officer for twenty-three years. From April, 1975, to January, 1976, Heck investigated six homicides; he also stated that, prior to April, 1975, he had participated in "many" homicide investigations. Heck testified that he examined the victims' wounds in this case. The trial court, over appellant's objections, permitted Heck to testify that, in his opinion, Christine Norton had "put up a fight" when she was attacked. Appellant now asserts that Heck was not qualified to express an opinion on this question. As we explained above, the trial court's decision that a witness is qualified to give an expert opinion is subject to review only for an abuse of discretion. *Page v. State, supra; Reid v. State, supra.* We think Heck's testimony reveals sufficient expertise in homicide cases from which the court reasonably could have concluded Heck was qualified to give an opinion as to whether Christine

Norton struggled with her assailant. We find no error in the admission of this testimony.

### XIV.

Appellant Norton argues the trial court permitted the prosecutor to repeatedly use leading questions in his examination of State witnesses. Initially, we note that several of the issues presented for review in this case have required a search through the record for their resolution. *Cf.* Ind.R. App.P. 8.3(A). Apparently counsel assumes this Court will conduct one further search of the record concerning this issue, for counsel refers us to only one instance where this occurred, despite his assertion that this alleged error occurred "repeatedly." On the occasion we are cited to, the following exchange occurred:

"Q. I will ask you whether or not you ever had a conversation with Benny Woody, possibly two months prior to the murders?

A. Yes, sir.

Q. And in that conversation, whether or not he told you—

Mr. Moore: Your honor, I would object to any type of leading question, at this point in time.

Mr. Barce: I don't think that's leading, Your Honor.

The Court: That's a proper way to phrase a question, "whether or not."

Mr. Moore: He said, "whether or not he told you," and he is going to ask for the response he wants from the witness. That would be leading question.

The Court: He has asked "whether or not." That will be answered yes or not. Objection overruled.

Q. Whether or not that Norton had asked Benny to kill his family, because the little boy had leukemia?

Mr. Moore: Your Honor, I would renew the same objections I made previously to this line of questions, and ask that they go on the record at this time, as to any questions regarding this subject matter.

The Court: Overruled.

A. Yes, he did."

Record at 637–38. Thus, the court ruled that a question phrased in terms of "whether or not" was not leading in form.

We agree with appellant that the particular question we have been referred to was leading in form. However, we explained in *Bell v. State*, (1977) 267 Ind. 1, 3–4, 366 N.E.2d 1156, 1158:

"Whether a leading question is to be allowed , . . is largely a matter of trial court discretion. Reversible error will be found only upon a showing of abuse of that discretion. *Siblisk v. State*, (1975) 263 Ind. 651, 655, 336 N.E.2d 650, 652. Questions intended in good faith to refresh the memory of a witness by directing his attention to persons and occurrences, are competent even where the witness is friendly to the party examining him. *Conway v. State*, (1889) 118 Ind. 482, 21 N.E. 285, 286.

We do not believe the trial court committed reversible error by allowing this question to be asked in leading form.

### XV.

Appellant next asserts the trial court permitted redirect examination to traverse beyond the scope of cross-examination. This alleged error occurred during the testimony of witness Dixie Koester. On direct examination by the prosecutor, Koester testified as to her activities, and those of appellant Norton's up to January 20, 1976. Norton and Benjamin Woody visited Koester at her mobile home in late December or early January. On that occasion, they obtained a green garbage bag containing several of the articles used in these killings. On January 20, 1976, ten days after these murders, some persons, apparently Norton and an uncle of his, delivered to Koester a Corvette automobile which she had purchased from Norton. Two days later, officers of the Illinois Bureau of Investigation obtained a search waiver from Koester in connection with the present case. This waiver form was offered and admitted into evidence during defense counsel's

cross-examination of Koester. At that time, she testified generally concerning the search of her mobile home and car. Koester also denied on cross-examination that there were any nude photographs of her and Norton in her trailer from December 30, 1975, to January 22, 1976. Counsel's apparent purpose with this line of questioning was to contradict Woody's testimony that he had seen nude photographs of Koester and Norton in the trailer when Woody and Norton went there shortly before the murders were committed.

On redirect examination, Dixie Koester testified that she had last seen appellant Norton on January 18, 1976. When she was asked where she had seen him, defense counsel objected, arguing this testimony was irrelevant and went beyond the scope of cross-examination. The trial court overruled this objection, and Koester testified that she and Norton had spent the weekend together at Davenport, Iowa.

We think evidence concerning appellant's activities with Dixie Koester approximately one week after Norton's wife and son were murdered was highly probative on a number of issues, including Norton's motive. In addition, defense counsel cross-examined Koester concerning her activities in the period from December 30, 1975 to January 22, 1976. This weekend excursion with Norton began on January 18, 1976. Thus, from a strictly chronological standpoint, these activities occurred within the time period covered by defense counsel on cross-examination. Technically, then, this testimony did not extend beyond the scope of cross-examination. Further, Koester testified, on direct and cross-examination, concerning certain aspects of her relationship with Norton. Subject, of course, to the constraints of relevancy, such testimony clearly opened up the general subject of their relationship. *United States v. Mackey*, (7th Cir. 1978) 571 F.2d 376, 383 n. 9; *Kolb v. State*, (1972) 258 Ind. 469, 476–77, 282 N.E.2d 541, 545–46; *Madison v. State*, (1971) 256 Ind. 353, 359, 269 N.E.2d 164, 167. *See, generally McDonald v. State*, (1976) 264 Ind. 477, 483, 346 N.E.2d 569, 573. This evidence was properly admitted.

## XVI.

Appellant Norton next argues the trial court improperly limited cross-examination concerning Lloyd Heck's alleged prior inconsistent statement given under oath. The issue centers around the *manner in* which the previous statement was to be presented to the witness. Defense counsel attempted to summarize or paraphrase portions of Heck's grand jury testimony and then ask Heck if he recalled that testimony. When the prosecutor objected, the trial court required counsel to read the question and answer found in the former testimony which contained the alleged inconsistent statement, and then ask the witness if he recalled making the statement. Appellant claims this was an unduly restrictive technique. He argues he should have had "the right to ask the witness about a specific prior statement as to a specific point."

This argument is similar to one argument advanced concerning the cross-examination of Benjamin Woody, which we discussed in Issue VI, *supra*. As we noted in that context, the conduct of cross-examination is a matter left largely to the trial court's discretion. *Ashbaugh v. State*, (1980) Ind., 400 N.E.2d 767, 772; *Gutierrez v. State*, (1979) Ind., 395 N.E.2d 218, 223. We think the manner required by the trial court for showing a prior inconsistent statement was entirely proper. *Gradison v. State*, (1973) 260 Ind. 688, 708, 300 N.E.2d 67, 81. Appellant makes no showing that this technique unduly restricted or rendered ineffectual his cross-examination. The record reveals that, in fact, counsel *was* able to question Heck "about a specific prior statement as to a specific point." We find no abuse of discretion in the trial court's handling of the form of cross-examination. *See Rogers v. State*, (1974) 262 Ind. 315, 315 N.E.2d 707; *King v. State*, (1973) 260 Ind. 422, 296 N.E.2d 113.

## XVII.

Norton asserts the trial court allowed the State to present improper rebuttal evi-

dence. Our search of the record reveals that State's witness Steve Jones testified regarding separate conversations he had with appellant Norton and police officer Jerry Stateler. The conversations concerned appellant's offer of money to Jones for killing Benjamin Woody. During his case-in-chief, appellant testified on his own behalf and denied having these conversations with Jones. The prosecutor subsequently called Stateler to the witness stand during rebuttal, and Stateler gave corroborative testimony that he and Jones did have the conversations Jones had testified to during the State's case-in-chief. Appellant now claims this was improper rebuttal evidence.

 We stated in *Teague v. State*, (1978) 269 Ind. 103, 121–22, 379 N.E.2d 418, 427: "Rebuttal evidence is, as the name indicates, that which tends to explain or contradict or disprove evidence offered by the adverse party." *See Buchanan v. State*, (1975) 263 Ind. 360, 368, 332 N.E.2d 213, 219. The scope of rebuttal evidence is a matter left to the trial court's discretion. *Layton v. State*, (1973) 261 Ind. 251, 255, 301 N.E.2d 633, 636. In the case before us, Stateler's testimony did not merely bolster Jones' veracity concerning a collateral matter. It tended to rebut appellant's statements about the conversations, and also corroborated other prosecution evidence on the State's theory that Norton hired Benjamin Woody to kill Norton's wife and son, in that it tended to show Norton's knowledge of the events. *Teague v. State, supra* ; *Denny v. State*, (1921) 190 Ind. 76, 81–82, 129 N.E. 308, 309–10. *See United States v. Wright*, (7th Cir. 1976) 542 F.2d 975, *cert. denied*, (1977) 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790. We do not find this to be improper rebuttal evidence, and the trial court did not err in admitting this evidence at this point in the trial.

## XVIII.

Appellant Norton next presents three instances of alleged prosecutorial misconduct. The first of these incidents occurred during the cross-examination of Benjamin Woody. Defense counsel was questioning Woody concerning the initial statements he gave to police. During a brief argument concerning an objection, the prosecutor mentioned that he had the tape recorded and written statements Woody gave, and offered to place them in evidence. Appellant argues this was an improper attempt by the prosecutor to tell the jury what evidence he had, rather than merely tendering the evidence. The second incident occurred while Benjamin Woody's wife, Beverly, was testifying. The prosecutor, by his questioning, led the witness into testimony concerning Norton's possession of "murder books." Appellant claims this was an attempt by the prosecutor to present an unduly prejudicial matter before the jury.

 Norton has waived any alleged error regarding these incidents of alleged misconduct. Counsel made no objection when the prosecutor made references to Woody's written and recorded statements. Regarding the "murder books," appellant's only objection at the time this evidence was adduced pertained to relevancy. In neither instance did counsel request a mistrial, or ask to have the prosecutor's statements or the testimony struck, or request that the jury be admonished in any fashion. Thus, appellant has not preserved either of these alleged errors. *Morgan v. State*, (1980) Ind., 400 N.E.2d 111, 114; *Lyda v. State*, (1979) Ind., 395 N.E.2d 776, 779.

 The third incident occurred during the testimony of Benjamin Woody. On direct examination, Woody testified that appellant Norton showed him nude photographs of Christine Norton. This apparently occurred in the Norton home the day before the murders. On cross-examination, defense counsel asked Woody what Norton did with the pictures after showing them to Woody. Woody stated that Norton put the pictures back into a dresser drawer, and that Woody did not remove them when he went to the home to kill Christine and Bret. The following exchange then occurred:

"Q. To your knowledge, they remained right there in that drawer?

A. Yes, sir.

Q. In which case, the police would have them now, right?

Mr. Hanner: Now, just a minute. We know where they are, but we are objecting to that question.

Mr. Moore: Your Honor, I move for a mistrial, at this point. This man is testifying over here; we are asking questions of this witness, and this man is telling what evidence they have and what evidence they don't have. He is testifying. I move for a mistrial, if you can't get him to conduct this trial properly."

Record at 562–63. Appellant now argues that the prosecutor's statement regarding the whereabouts of the pictures amounted to misconduct and warranted a mistrial.

It appears from the record that no such photographs were ever offered into evidence. Appellant's position, in fact, is that the photographs to which Woody referred never existed. The record likewise does not make this fact clear. The evidence on this point is conflicting. Appellant claims the prosecutor's reference to the whereabouts of the photographs was a deliberate misstatement, designed to give the jury the impression that these photographs did exist.

First, we are not at all certain that misconduct occurred. As we noted, it is unclear from the record whether the pictures actually existed. Thus, we cannot conclude, based merely upon appellant's assertion, that the prosecutor's reference to their whereabouts was a "deliberate misstatement."

Second, even if we assume the photographs did not exist, appellant Norton was not entitled to a mistrial based upon this statement. In *Rock v. State*, (1979) Ind., 388 N.E.2d 533, 536, we explained:

"In reviewing claims of prosecutorial misconduct, this Court considers the following: (1) whether or not the prosecutor in fact engaged in misconduct as determined by reference to the applicable case law and disciplinary rules; (2) whether the misconduct, under all of the circumstances, placed the defendant in a posi-

tion of grave peril to which [he] should not have been subjected, as measured by the probable persuasive effect of the misconduct on the jury's decision; and (3) whether there were repeated instances of misconduct which would evidence a deliberate attempt to improperly prejudice the defendant. *Maldonado v. State*, (1976) 265 Ind. 492, 499, 355 N.E.2d 843, 848."

If these photographs did not exist, and if the prosecutor had full knowledge of this fact, making the statement in question would constitute an act of misconduct. Code of Professional Responsibility DR 7–102(A)(4)–(6); DR 7–106(C)(1). However, in light of all of the evidence presented in this case, and in light of the collateral relevance of the alleged photographs, we do not believe, assuming the photographs did not exist, that appellant Norton was placed in a position of grave peril by the prosecutor's statement. *Jacks v. State*, (1979) Ind., 394 N.E.2d 166, 176; *Rock v. State, supra.* Therefore, the trial court properly denied appellant's motion for mistrial based on alleged prosecutorial misconduct.

### XIX.

Appellant Norton argues the trial court erred when it failed to sequester the jury during the trial. Appellant made an oral motion in limine which asked the trial court to hold inadmissible the testimony of two State witnesses, Terry Cox and David Peterson. This motion was made and argued outside the presence of the jury. At the same time, appellant asked the court to sequester the jury. Counsel's reasoning was that if Cox's and Peterson's testimony were held inadmissible, sequestration would be an appropriate measure to eliminate the risk that the jury would be exposed to reports of what Cox and Peterson would have testified to.

 Sequestration of the jury during trial is a matter of trial court discretion. To establish an abuse of this discretion, appellant must show that the jury has been prejudicially exposed to trial publicity. *Owen v. State*, (1978) Ind., 381 N.E.2d 1235, 1240; *Roberts v. State*, (1978) 268 Ind. 127,

131, 373 N.E.2d 1103, 1106; *Kincaid v. State*, (1976) 265 Ind. 345, 350–51, 354 N.E.2d 199, 203, *cert. denied*, (1977) 430 U.S. 972, 97 S.Ct. 1660, 52 L.Ed.2d 365. In the case before us, the allegedly prejudicial evidence which appellant feared jury exposure to was, in fact, properly presented to the jury. *See* Issue VII, *supra*. Thus, as appellant acknowledged before the trial court, the issue was rendered moot by the trial court's overruling of the motion in limine and the admission of Cox's and Peterson's testimony into evidence. The jury was not exposed to prejudicial publicity or information, and the trial court did not err in denying the motion to sequester the jury.

### XX.

 Norton next argues the trial court erred when it refused to discharge the jury and grant his motion for a mistrial. He claims the court should have taken these actions when it was given an "indication" that the jury commenced its deliberations while the trial was proceeding. It appears from the record that, after the court had recessed one day, the bailiff relayed a message to the judge that the jury had requested the meaning of "impeachment," and had also asked to hear Dixie Koester's testimony for a second time. Prior to the jury's request, the word "impeachment" had been used repeatedly in the jury's presence. Dixie Koester had testified on the previous day. The court refused to replay the testimony, and apparently told the jury they would be fully instructed at the close of all the evidence.

We think the motion for a mistrial was properly denied. The record indicates that, during Dixie Koester's testimony, the court cautioned her three times about speaking too softly. On at least one of these occasions, some of the jurors stated they had not heard her testimony. Thus, we believe it is reasonable to conclude that the jury asked that her testimony be repeated because they felt they had not heard all of it. The request for the meaning of "impeachment" likewise does not necessarily evidence jury misconduct. There is no indication as to how many jurors made this request, or if they had prematurely discussed the definition of "impeachment" or its possible application to the case.

Even if we were to conclude that some or all of the jurors engaged in some degree of misconduct, we do not believe a mistrial was required. We stated in *Gann v. State*, (1975) 263 Ind. 297, 300, 330 N.E.2d 88, 91: "Misbehavior or irregularity on the part of a juror must—in order to warrant a new trial—be gross and it must be shown to have probably injured the accused." Control and management of the jury is an area generally committed to the trial court's discretion. *Morris v. State*, (1977) 266 Ind. 473, 484, 364 N.E.2d 132, 139. Clearly, there has been no showing that the jury's behavior here constituted gross misconduct. Assuming these requests reflected all of the jurors' behavior, we think they were responding, albeit somewhat prematurely, as reasonable lay persons might respond in these situations. Further, we cannot say, from the record presented here, that the jury's conduct "probably injured" Norton. Although the record is not completely clear, appellant does *not* allege the court did not properly inform the jury that he would instruct them at the close of the evidence, and that they would not be able to hear Koester's testimony again. We find no error on this issue.

### XXI.

 Norton next claims the trial court erred in denying his motions for a directed verdict at the close of the State's evidence and at the close of all the evidence. The grounds alleged concern the "cumulative effect" of adverse evidentiary rulings and alleged prosecutorial misconduct. It is well established that a directed verdict is proper only: (1) where there is a total absence of evidence on a certain issue; or (2) where the evidence is without conflict and leads to only one inference, which is in favor of the accused. *Lyda v. State*, (1979) Ind., 395 N.E.2d 776, 778; *Mendez v. State*, (1977) 267 Ind. 67, 72, 367 N.E.2d 1081, 1084. Not only is neither of these situations

present here, appellant did not allege either ground in either motion. He was, therefore, not entitled to a directed verdict. Apparently what counsel sought was a mistrial based upon the grounds stated above. However, in light of our discussion on the first twenty issues presented here, it is clear appellant likewise was not entitled to a mistrial.

## XXII.

■ Norton next claims error in the trial court's giving of several instructions. First, he asserts the court erred when it gave State's instruction number one, which he describes as a "duty to convict" instruction. This instruction reads as follows:

"I submit this case to you with the confidence that you will faithfully discharge the grave duty resting upon you bearing in mind that the liberty of the accused is not to be trifled away nor taken by careless or inconsiderate judgment; but *if after a careful consideration* of the law and the evidence in the case you are satisfied beyond a reasonable doubt that the defendant, Donald K. Norton, is guilty, you should return your verdict accordingly. Duty demands it and the law requires it. You must be just to the defendant and equally just to the State. As manly, upright men and women charged with the responsible duty of assisting the Court in the administration of justice, you will put aside all sympathy and sentiment and look steadfastly and alone to *the law and the evidence in* the case and return into Court such a verdict as is warranted thereby."

Record at 206. This Court approved of this instruction in *Certain v. State*, (1973) 261 Ind. 101, 104, 300 N.E.2d 345, 347. Appellant has presented no valid reason for now disapproving of this language, and we decline to find error in the giving of this instruction.

■ Appellant Norton also argues the trial court incorrectly gave State's instruction number two on circumstantial evidence. The trial court instructed the jury in the following fashion:

"Evidence may be broadly classified as being either direct or circumstantial. An example of direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness; circumstantial evidence is proof of a chain of facts and circumstances indicating the guilt or innocence of a defendant.

The law makes no distinction between the weight to be given either direct or circumstantial evidence; it does require that the jury, after weighing all the evidence, must be convinced of the guilt of the defendant beyond a reasonable doubt before he can be convicted."

Record at 207. Appellant claims this language misstates the law and may have caused the jury to give undue weight to circumstantial evidence. However, the instruction cautioned the jury to weigh *all* of the evidence, and that, before they could find the defendant guilty, they must be satisfied of his guilt beyond a reasonable doubt. Further, we think this instruction correctly stated the law regarding the weight to be given circumstantial evidence. *Broecker v. State*, (1974) 161 Ind.App. 206, 210–11, 314 N.E.2d 428, 430–31. There is no error here.

■ Appellant also contends the trial court should not have given State's instruction number six. This instruction pertained to the jury's consideration of evidence of other crimes, and was given in this language:

"You are further instructed that the general rule in Indiana is that evidence of conduct which shows or tends to show that the defendant committed a crime separate and distinct from the crime for which he is charged is irrelevant and inadmissible. However, there are separate and established exceptions from this general rule. Evidence showing such separate crimes is admissible and the purpose for its introduction is to show intent, motive, identity, *guilty knowledge*, or a common scheme or plan. It is the probative value of such evidence to prove the crime charged that makes the evidence admissible and not the fact that it proves

or tends to prove the defendant guilty of other crimes."

Record at 211. This issue relates to appellant's argument, presented in Issue IX, *supra*, that evidence concerning separate crimes should not have been admitted. We held, however, that the evidence was properly admitted. Appellant further asserts that this instruction incorrectly states the law. This contention is without merit. *Porter v. State*, (1979) Ind., 397 N.E.2d 269, 272; *Grooms v. State*, (1978) Ind., 379 N.E.2d 458, 462.

■ The trial court, over objection, gave State's instruction number nine. This instruction read as follows:

"The Constitution of this State makes the jury the judges of the law as well as of the facts. But this does not mean that the jurors may willfully and arbitrarily disregard the law, nor that they may make and judge the law as they think it should be in any particular case. It means that the jurors under their oaths should honestly, justly and impartially judge the law as it exists and as it is found upon the statutes of our State in each particular case. It does not mean that the jurors may so judge the law in any case so as to make it null and void and of no force, but that they shall so judge the law as to give them all a fair and honest interpretation to the end that each and every law in each and every case may be fairly and honestly enforced. The facts must be judged and found by the jury from a careful consideration of all the evidence given in the case, and under your oaths, you have no right to arbitrarily disregard either the law or the facts in the case without just cause and after a fair and impartial consideration of both."

Record at 214. Appellant argues this instruction did not sufficiently inform the jury of its right to judge the law. This Court has held this instruction proper in several cases, including *Holliday v. State*, (1970) 254 Ind. 85, 90, 257 N.E.2d 679, 682, and *Parker v. State*, (1962) 243 Ind. 482, 485, 185 N.E.2d 727, 728. *See Feggins v.*

*State*, (1977) 265 Ind. 674, 359 N.E.2d 517. Thus, this instruction was a correct statement of the law and was properly given by the trial court. For that reason, the court did not err in refusing appellant's tendered instruction number twelve, which spoke to the same question. *Lynn v. State*, (1979) Ind., 392 N.E.2d 449, 452; *Brown v. State*, (1979) Ind., 390 N.E.2d 1000, 1004; *Pollard v. State*, (1979) Ind., 388 N.E.2d 496, 506; *Vaughn v. State*, (1978) 269 Ind. 142, 155, 378 N.E.2d 859, 866–67.

■ Norton further argues that State's instruction number fourteen should not have been given. The trial court instructed the jury in this fashion:

"The credibility of any witness may be impeached by proof that he has made statements out of court contrary to and inconsistent with what he testifies to on the trial concerning matters material and relevant to the issues joined. And in this case, if any witness had been thus impeached about material matters relevant to the issues in the case, then you have a right to reject all his testimony except in so far as he has been corroborated by other credible evidence in the cause.

If you should believe from the testimony in this case that any witness or witnesses have wilfully and intentionally testified falsely to any material fact in the case, intending by such false testimony to mislead and deceive you as to the truth in this case, you may, under such belief, disregard the whole or any part of the testimony of such witness or witnesses, if in your opinion, you are justified, under your belief, in so doing."

Record at 219. Appellant contends this instruction implied that the jury was bound to reject all impeached testimony except that testimony which was corroborated by other evidence.

We do not agree. The instruction merely stated that the jury *has the right* to reject a witness' testimony, and that the jury *may* disregard all or part of the testimony of a witness who they believe has testified falsely. Thus, the instruction is not, as Norton

claims, couched in mandatory terms. We held in *Liechty v. State*, ( 1930) 202 Ind. 66, 72, 169 N.E. 466, 468, that the two paragraphs of this instruction, when read together, constitute a correct statement of law. Therefore, the instruction was properly given, and the court likewise did not err by refusing appellant's tendered instruction on this subject.

■ Appellant further argues the court committed error when it gave the following four instructions:

"Malice, in law and as used in the statutes defining murder and manslaughter, has a technical meaning, including not only anger, hatred and revenge, but also every other unlawful and unjustifiable motive. It is not confined to ill will towards one or more individual persons but is used and intended to denote an action arising from any wicked and corrupt motive, a thing done with bad or malicious intent and accompanied by such circumstances as carry in them the plain indication of a heart devoid of concern for social duty and fatally bent on mischief. Malice, therefore, may be implied from any deliberate and cruel act against another, however sudden. Malice may be implied from the intentional and unlawful use of a deadly weapon in such manner as in all reasonable probability will and does in fact cause death."

"Premeditation is defined as the act of premeditating in advance; deliberation upon a contemplated act; plotting or contriving; a design formed to do something before it is done.

As to premeditation, the formation of the intention to kill and the killing may be as instantaneous as successive thoughts."

"Purposely is defined as intentionally, designedly and consciously doing an act. If the act of killing is perpetrated with a deadly weapon used in a manner likely to produce death, the purpose to kill may be inferred from the act of killing."

"The elements which distinguish the crime with which the defendant is charged in this case are as follows: To be Murder in the First Degree it must be established by the evidence, beyond a reasonable doubt that the killing was done purposely and with premeditated malice by a person hired to kill. To be Murder in the Second Degree it must be established by the evidence, beyond a reasonable doubt that the killing was done purposely and maliciously. A killing is done purposely and maliciously when the intention to unlawfully take life is deliberately formed in the mind; that is formed in a state of cold blood, when the mind is capable of forming and entertaining a malicious intent, and when it is established beyond a reasonable doubt from the facts and circumstances in evidence that a killing was unlawful and done purposely and maliciously it is Murder in the Second Degree.

Malice in the law and as used in the statutes defining Murder, is not confined to anger, hatred, revenge or ill will toward one or more individuals, but it is intended to denote an action flowing from a wicked and corrupt motive; a thing done with a bad or malicious intent, where the fact has been attended by such circumstances as carry in them the plain indication of a heart without regard for social duty and fatally bent on mischief. Express malice is that condition of a person's mind which shows a deliberate intention to unlawfully kill a fellow creature. Express malice is established when it has been shown by the evidence beyond a reasonable doubt that the act resulting in death was done with a deliberate mind and formed design to unlawfully kill a human being."

Record at 213, 217, 218, 220. Appellant claims these instructions were repetitive and tended to over-emphasize the mental element of the charges.

We think these instructions were proper. While the instructions do contain slight repetitions on the definition of malice, we do not believe the court's explanations of this difficult element were improper or dwelled unnecessarily on this matter. When taken as a whole, these instructions do not, as

appellant suggests, amount to an "argument" by the trial court as to the applicability of these terms.

## XXIII.

■ Appellant finally contends the trial court erred when it refused to give several of his tendered instructions. First, he claims the court improperly refused his tendered instruction number fourteen on "probabilities." Norton argues this instruction was a correct statement of the law regarding the degree of certainty required to remove reasonable doubt. However, without deciding whether this contention is true, we find that final instruction number seven and Norton's tendered instruction number eight, which was also given by the trial court, properly and fully instructed the jury on the application of the reasonable doubt standard. The court did not err by refusing a tendered instruction, the substance of which was adequately covered by the instructions which were given. *Lynn v. State, supra; Brown v. State, supra; Vaughn v. State, supra.*

■ Norton next argues his tendered instruction number eighteen should have been given. This instruction concerned the defense of intoxication, and read as follows:

"The defendant is charged as an accessory to an act of Benjamin Woody. There has been testimony about Benjamin Woody's use of drugs.

Voluntary intoxication by drugs will not excuse a crime. However, its [sic] Statute for murder for hire requires a criminal intent. Benjamin Woody cannot possess such intent if he was too intoxicated from drugs, for a conscious exercise of his will or in other words, too intoxicated to form the necessary criminal intent.

If you find that Benjamin Woody did not possess criminal intent because he was too intoxicated, then you must find the defendant not guilty."

Record at 239. Thus, appellant contends that if Woody were too intoxicated to form a specific intent to murder for hire, this fact would exonerate appellant Norton from any liability as an accessory before the fact.

Even if we assume that, theoretically, the intoxication of the principal would relieve the accessory of liability, a question we do not decide here, this instruction was properly refused. While there was evidence concerning Woody's general use of drugs *in the past*, there was no evidence from which the jury reasonably could have found that Woody was intoxicated at the time of these killings to a degree sufficient to make him totally incapable of forming a specific intent. *Lyda v. State*, (1979) Ind., 395 N.E.2d 776, 781; *Davis v. State*, (1976) 265 Ind. 476, 478, 355 N.E.2d 836, 838. The trial court did not err in refusing to read this instruction to the jury.

Appellant contends the trial court erroneously refused to give his tendered instruction number fifteen. This instruction purported to explain the defense of abandonment, and read as follows:

"You are instructed that the defendant herein is charged with murder for hire because he allegedly hired Benjamin Woody to kill Christine Ann Norton and Bret Christopher Norton. If you find that there was a common scheme or purpose entered into between the defendant and Benjamin Woody beyond a reasonable doubt, that thereafter Benjamin Woody abandoned said common scheme or purpose and he committed the acts of killing Christine Ann Norton and Bret Christopher Norton after said common scheme or purpose was abandoned, then you should find the defendant not guilty of the charges in both informations."

Record at 236. Thus, appellant contends that if Woody somehow abandoned a common plan he had previously acted under with Norton, the latter would be absolved of liability.

■ This argument contains two fatal flaws. First, Norton cannot avail himself of any alleged abandonment by Woody. Fundamentally, the defense of abandonment is available to one who, *through his own actions*, withdraws his aid and encour-

agement and wholly and effectively detaches himself, from the criminal enterprise. *Barnes v. State*, (1978) Ind., 378 N.E.2d 839, 843; *Harrison v. State*, (1978) Ind., 382 N.E.2d 920, 926; *Hedrick v. State*, (1951) 229 Ind. 381, 389, 98 N.E.2d 906, 910. The policy behind this defense is one of refusing to impose liability upon a person who has a "change of heart" and voluntarily and intentionally detaches himself from the commission of a crime before the enterprise is consummated or "has become so inevitable that it cannot reasonably be stayed." *Hedrick v. State, supra.* The decision to abandon must come from within, and must not be due to extraneous factors. *Barnes v. State, supra; W. LaFave and A. Scott, Criminal Law*, p. 448 (1972). The voluntariness of the detachment can be said to "negative dangerousness." *Criminal Law, supra*, at 450, *quoting* Model Penal Code § 5.01 Comment (Tent. Draft No. 10, 1960). For that reason, the defense is intended to be available only to the person who actually physically and mentally abandons the enterprise. This defense is not intended to protect a co-participant of the one who abandons, especially when the co-participant is not aware of the abandonment and takes no steps on his own to detach himself or withdraw his aid and encouragement from the crime. Thus, even if Woody did abandon the scheme, Norton can gain no vicarious relief.

Second, appellant was charged as an accessory before the fact. He contends the jury could find that Woody abandoned a prearranged plan the two had created and killed Christine and Bret Norton of his own initiative and for his own reasons. However, the prosecution was not required to prove the existence of a preconceived plan or scheme to prove guilt as an accessory before the fact. "[M]ere concerted action or participation in the illegal acts is sufficient." *Simmons v. State*, (1974) 262 Ind. 300, 302, 315 N.E.2d 368, 369; *Bigbee v. State*, (1977) Ind.App., 364 N.E.2d 149, 155. Thus, it is irrelevant that Woody may have been acting pursuant to a preconceived scheme and may have, in his mind, decided he was not scheming with Norton any long-

er. Therefore, this tendered instruction incorrectly stated the law, and the trial court correctly refused to read the instruction to the jury. *Lyda v. State, supra; Davis v. State, supra.*

Finally, Norton asserts the trial court erred when it refused to give his tendered instructions numbers four and five. These instructions concerned the question of hiring, and were couched in the following terms:

> "The defendant is charged with murder for hire. To convict the defendant of first degree murder, you must determine beyond a reasonable doubt that a 'hiring' took place. Hiring connotes an exchange of money or something of value for a service. In this case, it connotes an actual transfer of money for the act of killing Christine Ann Norton and/or Bret Christopher Norton. If there was a mere promise of money in exchange for the killing of Christine Ann Norton and/or Bret Christopher Norton, this would not be sufficient to be murder for hire."

> "The defendant is charged with murder for hire. Hired means to purchase by the exchange of money or something of value of another person's services. If there was no exchange of money or something of value, then you cannot determine that there had been a 'hiring' beyond a reasonable doubt."

Record at 225–26. Initially, we note, as we explained in Issue II, *supra*, the information alleged that Norton was an accessory before the fact of a murder for hire committed by Benjamin Woody. The homicide statute in effect at the time these murders were committed, Ind. Code § 35–13–4–1 (Burns 1975), read in pertinent part:

> "(b) Whoever perpetrates any of the following acts if guilty of murder in the first degree . . . .:

> (6) Killing a human being purposely and with premeditated malice:

(ii) by a person hired to kill;

Appellant contends that, to constitute a hiring under this statute, there must be an actual exchange of something of value for a service. He asserts that a promise of money in exchange for a killing is not a sufficient hiring.

■ We disagree. Appellant's proposed definition of "hire" covers a much narrower range of activity than we think the legislature intended. We note, for example, that Black's Law Dictionary defines "hire" as: "To purchase the temporary use of a thing, or *to stipulate for the labor or services of another.*" "The words the legislature chose are not to to be given strict connotations within the narrow parameters of the statutory definitions of crimes." *Carson v. State,* (1979) Ind., 391 N.E.2d 600, 602. A murder for hire under this statute has been committed when one offers or promises compensation to another for performing a killing, and the other person commits the murder pursuant to or in response to this offer or promise. We are not persuaded that "money or something of value" must, in fact, change hands before or after the killing, for there to have been a "hiring." An intervening factor, such as the apprehension or surrender of the perpetrator after the killing, would not alter the fact that a murder pursuant to a hiring had been committed. Likewise, if, subsequent to the killings, the offeror refused to pay the perpetrator as he had promised, this refusal would not alter the fact that the perpetrator had been hired before the killing. For these reasons, appellant's tendered instructions incorrectly stated the law, and were, therefore, properly refused by the trial court.

The judgment of conviction is affirmed. The death sentence is vacated, and the cause is remanded with instructions to enter a sentence of life imprisonment on each count.

GIVAN, C. J., and HUNTER, DeBRULER and PRENTICE, JJ., concur.