Thomas D. LAWSON, Appellant,

v.

STATE of Indiana, Appellee.

No. 1177S797.

Supreme Court of Indiana.

Nov. 25, 1980.

Marion W. Withers, Jones & Withers, Anderson, for appellant.

Theodore L. Sendak, Atty. Gen., Jeff G. Fihn, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Appellant Thomas D. Lawson was charged, by way of indictment in Madison Circuit Court, with first degree murder, Ind.Code § 35–13–4–1 (Burns 1975). This charge arose out of the shooting death of David Bush on March 24, 1976. The evidence reveals that David Bush was the fiance of Sandy Lawson, appellant's step–daughter. This cause initially came to trial on September 15, 1976, and ended with a hung jury. Thereafter, appellant moved for a change of venue, with the resulting transfer of the cause to the Delaware Circuit Court. The second trial began on February 7, 1977. On March 10, the jury returned a verdict of guilty of first degree murder. The trial court subsequently sentenced appellant Lawson to life imprisonment.

Appellant presents eight issues for our consideration, concerning: (1) whether the trial court erred in permitting the prosecutor to ask voir dire questions concerning accessory liability and to present evidence of appellant's participation as an accessory, and whether the court erred in giving final instructions concerning accessory liability; (2) whether the trial court erred in admitting into evidence State's Exhibit forty–four; (3) whether the trial court erroneously permitted the prosecutor to use leading questions; (4) whether the trial court erred in admitting into evidence State's Exhibits thirty–five, thirty–seven, sixty–three, and seventy–five; (5) whether the trial court erred in allegedly refusing to permit Lawson to testify as to his reasons for purchasing ammunition; (6) whether the trial court erred in refusing to allow testimony from proposed defense witness Leo Harris; (7) whether the trial court erred in "openly chastising" Lawson and his counsel; and (8) whether the evidence is sufficient to sustain the conviction.

## I.

Lawson was charged in the indictment with first degree murder under Ind.Code § 35–13–4–1 (Burns 1975). The indictment alleged that:

"On or about the 24th day of March, 1976, at and in the County of Madison, State of Indiana, the defendant, Thomas D. Lawson, did then and there unlawfully, feloniously, purposely, maliciously and with premeditation kill and murder one David Bush, a human being, by then and there unlawfully, feloniously, maliciously and with premeditation, shooting at and against said David Bush with a certain caliber handgun loaded and charged with gun powder and metal slugs, then and there held in the hands of said Thomas D. Lawson, and did then and there and thereby inflict mortal wounds in and upon the body of said David Bush of which said mortal wounds the said David Bush died in said aforementioned County and State on the aforementioned date;

All of which is contrary to the form of the Statute in such cases made and provided, to–wit: Ind.Code § 35–13–4–1 (Burns 1975), and against the peace and dignity of the State of Indiana."

Record at 27. Thus, the indictment charged Lawson as the principal in this crime. Pursuant to Ind.Code § 35–5–1–1 (Burns 1975), appellant filed an alibi notice. The prosecution's answer to this notice read, in part, as follows:

"    . . .

However, the State of Indiana further advises the Defendant and his counsel that evidence will be submitted whereby the Defendant, Thomas D. Lawson, may be convicted by reason of Indiana Code § 35–1–29–1 and the State will request that the Court instruct the jury thoroughly regarding Accessory Before the Fact."

Record at 36. During voir dire of the prospective jurors, the prosecutor read and discussed the accessory liability statute referred to above. In addition, the prosecutor

presented a great deal of evidence to support the theory that Lawson may have hired someone to kill Bush and thus was an accessory before the fact. Finally, the trial court gave several instructions to the jury on accessory liability. Appellant Lawson now contends that, in the face of an indictment which charged him as a principal, the prosecution should not have been allowed to proceed under the alternative theory that Lawson may have been an accessory. He claims he was thereby denied his right to be informed of the charge against him.

■ Appellant's argument is clearly without merit. A similar contention was presented recently in *Abrams v. State,* (1980) Ind., 403 N.E.2d 345. We disposed of[*] the issue by explaining that one may be charged as a principal and convicted on evidence that he aided in the commission of the crime. *Id.* 403 N.E.2d at 347. This is, of course, a well–established principle of law in this State. *See Prather v. State,* (1969) 252 Ind. 141, 246 N.E.2d 479; *Grecco v. State,* (1960) 240 Ind. 584, 166 N.E.2d 180, 167 N.E.2d 714 *cert. denied,* 364 U.S. 893, 81 S.Ct. 227, 5 L.Ed.2d 191; *Bays v. State,* (1959) 240 Ind. 37, 159 N.E.2d 393, *cert. denied,* (1960) 361 U.S. 972, 80 S.Ct. 605, 4 L.Ed.2d 551; *Workman v. State,* (1939) 216 Ind. 68, 21 N.E.2d 712, 23 N.E.2d 420. *Cf. Norton v. State,* (1980) Ind., 408 N.E.2d 514. In addition, instructions on an accused's liability as an accessory under § 35–1–29–1, *supra,* are proper where the accused is charged as a principal, assuming the evidence supports such instructions. *Abrams v. State, supra; Doss v. State,* (1971) 256 Ind. 174, 267 N.E.2d 385.

■ While the evidence will be discussed more fully in subsequent portions of this opinion, we note for purposes of this issue that several persons testified that appellant Lawson tried to hire them to kill David Bush. Lawson paid money to some in advance in consideration for their performing the killing. He also took two people to a spot within sight of Bush's house, where he described the layout of the house and explained in detail how he wanted the killing to take place and how he wanted the crime to appear to the police. There were no eyewitnesses to the murder, and, as noted above, Lawson presented an alibi defense which purported to account for his whereabouts at the time the killing occurred. Clearly, the trial court did not err in allowing the prosecutor to proceed under alternative theories of accessory and principal liability, nor in instructing the jury in accordance with this theory. This issue is without merit.

## II.

■ Appellant Lawson next argues the trial court erroneously admitted into evidence State's Exhibit forty–four. This exhibit was a written message, admittedly authored by Lawson. The remarks or statements in the letter are directed to a female named "Sandy." This is, of course, the name of appellant's step–daughter. Appellant claims this letter or message had no probative value on any of the issues of this case, was highly prejudicial to him, and therefore should not have been admitted.

We find this exhibit was properly admitted. To fully explain the relevance of this writing, we must initially discuss other pertinent facts adduced at the trial. The prosecution proceeded under the theory that appellant Lawson's motive was related to extreme jealousy concerning his step–daughter. Sandy Lawson testified at length concerning appellant's behavior toward every boy friend she had had as a teenager and as a young adult. In every instance, appellant forced an end to the relationship by insulting and harassing the boy involved and constantly pressuring his step–daughter, telling her the young man was "no good" and a bad influence on her. Such behavior on Thomas Lawson's part continued unabated when Sandy Lawson began seeing David Bush, even though she as approximately twenty–two years of age at the time. Because of her step–father's harassment, Sandy moved out of his house in July, 1975, shortly after her relationship with Bush began. A great deal of evidence was presented concerning appellant Thomas Lawson's dislike of Bush and his attempts

to bring an end to the relationship with Sandy. Sandy testified that appellant attempted several times to persuade her to move back into his house, and, on one occasion, struck her with his fist when she refused. Appellant also threatened to kill David *and* Sandy, and told Sandy that he carried a loaded gun with him at all times. In addition, appellant Thomas Lawson kept a record on a calendar of Sandy's relationship and activities with Bush, and noted the nights on which Sandy stayed at Bush's house, sometimes including graphic descriptions of their alleged sexual activities on those nights.

In this context, the writing was clearly relevant to show appellant's motive. The letter or message was written in the second person, to "Sandy," and attempted to hypnotize the reader. The writing persuaded Sandy to allow her "unconscious mind" to take over her actions and her body. The message proceeded to warn her that her "conscious and unconscious minds" would conflict on matters which troubled her, but that she should allow her unconscious mind to dictate her feelings and responses. Appellant further explained in the writing that Sandy would feel sexual urges or yearnings, and that, in such instances, she should follow the suggestion of her unconscious mind. Appellant told Sandy in the letter that he would be giving her books which contained descriptions of sexual activity. He advised her that reading these books would also cause her to become sexually aroused. According to appellant's writing, Sandy should follow these sexual urges and the dictates of her unconscious mind and give herself sexual pleasure by masturbating while lying on the bathroom floor. The message further encouraged her to do this while she and her step–father were alone in the house. The letter concluded by telling Sandy that she was "thoughtful" of her step–father and that he was likewise "thoughtful" of her. The writing encouraged her to associate the "father" in the books he would give her with her father. The intended result, apparently, was a sexual attraction on Sandy's part toward her step–father. He told her that he was

understanding of her "needs and desires," and that "no boy can take the place of your father."

This writing, then, is obviously probative on the question of appellant's motivation in killing his step–daughter's fiance. Appellant acknowledges writing this message, but claims he did so sometime in the period of 1958 to 1960. He asserts that this writing was actually a script or story line for a "stag film" he planned to help produce and that the "Sandy" mentioned in the "script" was not his step–daughter. Thus, he claims, the writing bore no relationship to his step–daughter or this crime. The content of the message, however, tends to speak for itself; it is written in the second person, encouraging a girl named "Sandy"– among other things–to reject other males and have sexual relations with her father. Of course, the jury was free to reject appellant's explanation of the writing and conclude that the letter referred to Sandy and him. *Lock v. State*, (1980) Ind., 403 N.E.2d 1360, 1373; *Riggenbach v. State*, (1979) Ind., 397 N.E.2d 953, 956; *Sypniewski v. State*, (1977) 267 Ind. 224, 232, 368 N.E.2d 1359, 1364. We find this writing bears a great deal of relevance to this case and was properly admitted. *See, e. g., State v. Holt*, (Mo.1980) 592 S.W.2d 759; *State v. Brown*, (1970) 4 Or.App. 219, 475 P.2d 973. *See also Riggenbach v. State, supra; Commonwealth v. Costanzo*, (1979) —— Pa.Super. ——, 410 A.2d 324; *Hurst v. State*, (1974) 54 Ala.App. 254, 307 So.2d 62; *People v. Johnson*, (1970) 24 Mich.App. 1, 179 N.W.2d 658. *See generally Bertram v. State*, (1978) 268 Ind. 368, 375 N.E.2d 1098; *Bruce v. State*, (1978) 268 Ind. 180, 375 N.E.2d 1042; *Johnson v. State*, (1970) 254 Ind. 465, 260 N.E.2d 782.

■ Appellant also presents a brief argument to the effect that police gained possession of the letter in violation of his Fourth Amendment right against unreasonable searches and seizures. However, this issue was not raised in the motion to correct errors; therefore, any Fourth Amendment error on this issue has been waived. Ind.R. App. 8.3(A)(7).

■ Finally, appellant claims this exhibit was inadmissible because it revealed his commission of an unrelated crime. We are not directed to any specific crime which may have occurred in the writing of this letter. If no crime was attempted or committed, of course, this rule does not operate to exclude the challenged evidence. *Norton v. State*, (1980) Ind., 408 N.E.2d 514, 524. Even if we were to assume that a separate crime was committed, we believe this exhibit was nevertheless admissible. Evidence of a separate crime may be admissible if probative on the question of motive. *Norton v. State, supra; Gutierrez v. State*, (1979) Ind., 395 N.E.2d 218, 222; *Pierce v. State*, (1977) 267 Ind. 240, 248, 369 N.E.2d 617, 621. As we explained above, this exhibit was clearly probative on the question of motive. The court did not err in admitting this exhibit.

### III.

■ Appellant contends the trial court improperly permitted the prosecutor to ask leading questions of one of the State's witnesses. This witness, Thelma Berry, testified that she had known appellant Lawson and his family approximately five and one-half years. Her testimony extensively covered appellant's relationship with his family generally and with Sandy Lawson in particular. Thelma Berry related several conversations she had had with Thomas Lawson concerning Sandy, his relationship with her, and her relationship with David Bush.

Appellant refers us to three instances where leading questions were permitted with detrimental results. First, the prosecutor asked Thelma Berry if she had had any conversation with appellant Thomas Lawson concerning where David Bush lived. Second, Thelma Berry was asked if she had had any conversation with appellant regarding Sandy's engagement ring and her hoped–for wedding ring. Finally, on redirect examination, Thelma Berry was asked if she had stated on cross–examination that what she observed in appellant's actions towards Sandy was not "fatherly love." On each occasion, appellant objected to the leading nature of the question. The trial court overruled the objections.

While we agree that these questions are rather leading in form, we do not believe the court committed reversible error in allowing the questions to stand and be answered. We explained in *Norton v. State*, (1980) Ind., 408 N.E.2d 514, 527, *quoting Bell v. State*, (1977) 267 Ind. 1, 3–4, 366 N.E.2d 1156, 1158:

" 'Whether a leading question is to be allowed . . . is largely a matter of trial court discretion. Reversible error will be found only upon a showing of abuse of that discretion. *Siblisk v. State*, (1975) 263 Ind. 651, 655, 336 N.E.2d 650, 652. Questions intended in good faith to refresh the memory of a witness by directing his attention to persons and occurrences, are competent even where the witness is friendly to the party examining him. *Conway v. State*, (1889) 118 Ind. 482, 21 N.E.2d 285, 286.' "

As we explained above, this witness gave a great deal of detailed testimony concerning relationships that existed and evolved over a five and one–half year period. We believe these questions simply directed her attention to certain occurrences and did not prejudice appellant. We do not think the trial court abused its discretion in permitting these questions and the answers to them. *Norton v. State, supra; Bell v. State, supra.*

### IV.

Appellant next claims the trial court erred when it admitted into evidence State's Exhibits thirty–five, thirty–seven, sixty–three, and seventy–five. These exhibits were three pistols and a separate pistol barrel. Appellant claims the weapons were inadmissible because none were shown to have been used to kill David Bush, nor to have been in appellant's possession at the time this killing occurred.

■ Exhibits thirty–five and thirty–seven were a .32 caliber Colt revolver and a replacement barrel for this gun, respectively. These items were purchased for appellant Lawson shortly before the murder of David Bush. A firearms expert testified

that the bullets found in the victim's body could not have come from the barrel of exhibit thirty–five; however, he also stated that the bullets could have been fired through the replacement barrel, exhibit thirty–seven, and that this replacement barrel could have been attached to exhibit thirty–five. Witnesses placed these exhibits in appellant's possession shortly before the murder. The exhibits and the testimony surrounding them were thus illustrative of appellant's preparation and, therefore, his premeditation and intent. *York v. State*, (1978) Ind.App., 380 N.E.2d 1255, 1259; *Hayes v. State*, (1968) 3 Md.App. 4, 8–10, 237 A.2d 531, 533–34. *See Allanson v. State*, (1975) 235 Ga. 584, 221 S.E.2d 3.

■ Exhibit seventy–five is a pistol taken from the trunk of appellant's car by his step–daughter, Sandy Lawson. As we mentioned above, Sandy testified that her step–father threatened to kill Bush and her, and told her he carried a loaded gun at all times. The day after this threat was made, Sandy searched appellant's car and discovered and removed this exhibit. The firearms expert also testified that this weapon could not have been used to kill David Bush; once again, however, appellant's possession of this weapon, together with the verbal threats, are probative on the question of his preparation and premeditation. *Id.*

■ Exhibit sixty–three is a .32 caliber Harrington–Richardson revolver. This weapon, at one time, belonged to witness Steve Wilson, who testified that he "found" it. The evidence showed that appellant attempted to hire Wilson and another man to murder David Bush. At the second or third meeting of Wilson and appellant, Wilson apparently struck appellant with his fists and proceeded to rob him of the money which Lawson was prepared to offer the two men in exchange for the proposed killing of Bush. Wilson testified that he actually had no intention of killing Bush as appellant wished. He also stated that he had this exhibit in his possession at the time of this meeting, but did not display it to or use it on appellant. Wilson subsequently pawned the gun to one Bruce Johnson, who, in turn, sold it to Robert Hunt. Police recovered the gun from Hunt. The firearms expert testified that this weapon could not have been used in the Bush killing.

We hold the trial court did not err in admitting this exhibit into evidence. Wilson's possession of this weapon tended to corroborate details in his story of Lawson's attempt to solicit his participation in the killing. His possession of the gun also tended, to a certain extent, to show that, in seeking assistance from an individual of Wilson's apparent character, appellant entertained more than just a passing thought on the subject of killing Bush, and seriously desired to have the killing done. The evidence also showed that Lawson apparently believed Wilson was a "hit man" from Detroit. This exhibit, as its possession was traced to Steve Wilson, was thus admissible to show appellant Lawson's preparation and premeditation. *Id.*

In any event, in spite of the exhibit's rather limited probative value, we do not believe its admission into evidence unduly prejudiced appellant. As we noted above, the firearms expert stated that this gun could not have been the murder weapon; in fact, we are cited to no instance in which the prosecutor suggested or argued that it was. Moreover, we are cited to no instance in which any witness' testimony placed this revolver in appellant's possession. As we explained above, this exhibit merely helped corroborate small details of incidents which supported the State's theory. The trial court did not err in admitting these four exhibits into evidence.

V.

■ Appellant Lawson next argues the trial court erroneously refused to permit him to explain during his testimony why he purchased ammunition twice in a two–to–three–day period shortly before Bush was murdered. When defense counsel specifically asked Lawson why he had had another person buy ammunition for him, the prosecutor objected and the trial court sustained

the objection. However, the record reveals that appellant was permitted to give his reasons for these actions. He testified at some length concerning several conversations he had had with one Travis Ragland. Lawson explained that the tenor of their conversations increasingly led him to believe that Ragland was planning to burglarize Lawson's home. Ragland allegedly asked appellant if his home was secure, whether he kept any guns in the house, and whether he kept guard dogs. Thus, appellant testified, he became fearful of Ragland and his motives. In this context, appellant then testified about his purchase of ammunition. Thus, appellant was permitted to explain his alleged motivation for making the purchases. Therefore, we do not believe appellant was prejudiced by the trial court's sustaining the objection to the one specific question concerning his alleged motivation.

## VI.

Appellant Lawson next contends the trial court erred in refusing testimony from defense witness Leo Harris. Defense counsel announced on March 8 that he had concluded his case–in–chief. On the following morning, counsel requested permission to reopen his case. The court granted this request, and counsel called Leo Harris as his next witness. Harris was a friend and jail cellmate of Lawson's. The prosecutor objected to Leo Harris being allowed to testify on the grounds, *inter alia*, that the subject matter of his testimony would not be proper surrebuttal, and that the testimony pertained to a collateral matter which was not a proper subject of impeachment. Defense counsel acknowledged that part of Harris' testimony would serve to impeach witness Paul Baisden, but asserted that Harris would also corroborate certain portions of appellant Lawson's testimony.

We do not think the trial court erred in refusing to allow this testimony. Part of the testimony apparently would have been used for impeachment purposes. However, appellant was attempting to impeach Baisden regarding the frequency

with which Baisden talked with Lawson in jail, and how many times Baisden read certain transcripts Lawson had in his possession. These were clearly collateral matters, and not properly the subject of impeachment. *Grooms v. State*, (1978) 269 Ind. 212, 218–19, 379 N.E.2d 458, 462. *See Anderson v. State*, (1977) 267 Ind. 289, 370 N.E.2d 318. In addition, according to defense counsel's offer of proof, Harris merely would have corroborated Lawson's testimony on minor points concerning their activities in the jail. The exclusion of cumulative evidence is reviewable only for an abuse of discretion. *See Smith v. State*, (1968) 250 Ind. 125, 235 N.E.2d 177. Considering the collateral, apparently insignificant content of Harris' proposed testimony as revealed by the offer to prove, we find no such abuse in this case. *See Anderson v. State, supra.*

## VII.

Appellant next argues the trial court erred in "openly chastising and derogating" Lawson and defense counsel in front of the jury. Appellant refers us to three instances in which, he claims, the trial court's remarks to Lawson or his counsel caused prejudice in the minds of the jurors. In support of this argument, appellant properly asserts that a judge must be impartial and refrain from making unnecessary comments which might prejudice the jury. We do not find this principle to have been violated in the case before us.

Two of the incidents complained of involve remarks made to Lawson by the court. On one occasion, the court instructed Lawson not to make facial gestures while witnesses were testifying. While the record does not clearly reveal the exact nature of Lawson's behavior, the court's remarks indicate that Lawson was making facial gestures in response to testimony being given. Defense counsel does not dispute that Lawson made these gestures. Clearly, the trial court acted properly in admonishing Lawson in this situation. Without question, the court has a duty to remain impartial and refrain from making unnecessary comments or remarks. *See, e.*

*g., Brannum v. State,* (1977) 267 Ind. 51, 366 N.E.2d 1180. However, of equal importance is the trial court's duty to manage and control the proceedings which are conducted before him. *See, e. g., Jaske v. State,* (1978) 269 Ind. 196, 379 N.E.2d 451. Such control obviously extends to the potentially disruptive behavior of spectators, witnesses, parties and attorneys. Besides being childish, Lawson's conduct may very well have been distracting or disconcerting to all who saw it, including the witnesses and jurors. Lawson may have thereby disrupted the witness' testimony or forced the jury to divide its attention between the testimony being given and his display. Clearly the trial court was obligated to eliminate such a possibility, and committed no error in admonishing the defendant in this case. *See Illinois v. Allen,* (1970) 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353.

▆ The second incident involving the defendant occurred during his testimony. After one of the many instances in which Lawson gave volunteered statements, in spite of the court's admonitions to the contrary, the court responded to the prosecutor's objection with this remark:

> "You have been told repeatedly, sir, about these voluntary statements. I know that you understand [the] English language and understand the direction of the Court, and you will not make those sorts of statements.
>
> .     .     .     .     .
>
> Anything not responsive to the question [of a] voluntary nature is not admissible."

Record at 2372–73. Lawson's testimony is sprinkled with instances in which he testified improperly, gave volunteered statements, failed to answer questions, and argued with the prosecutor. The court and defense counsel repeatedly instructed Lawson concerning the manner in which he must give his testimony and answer questions. The trial court, of course, should give such instructions to any witness in this situation, and properly did so here. We do not find the specific remark of which appellant complains to be prejudicial to him.

Lawson had repeatedly failed to follow entirely proper instructions—which were also, of necessity, made in front of the jury—and the court was simply responding to these repeated instances of Lawson's recalcitrant behavior. The court's duty to remain impartial and refrain from gratuitous comments does not prevent reasonable admonitions of the type found here. Moreover, the trial court's duty to manage the proceedings also includes directing the taking of testimony to insure that the rules of procedure and evidence will be adhered to. The remark in question was merely a reworded effort to maintain control over the course and conduct of the proceedings. *See Jaske v. State, supra.* Further, both of these allegedly prejudicial statements were invited by Lawson's recalcitrant and disruptive behavior. In their context, neither was improper, and neither can be said to have prejudiced appellant.

▆ The third instance of allegedly prejudicial conduct by the trial court involved defense counsel. During the direct and redirect examination of Sandy Lawson, the prosecutor attempted to elicit testimony concerning conversations between appellant and his wife which were overheard by Sandy. On several occasions, defense counsel objected to the phraseology of the questions and what he termed the prosecutor's or the witness' "characterization" of the statements. These repeated instances culminated in the following question by the prosecutor and exchange between defense counsel and the court:

"Q: Will you give us the conversation as you recall it between your step–father and your mother at that particular time?

Mr. Withers: Your Honor, again I will object, another implication, 'as you recall it.' Now, why doesn't he ask for the conversation. I will object to the nature of the question. It calls for conversation.

The Court: Overruled. These objections are getting just a little bit burdensome, and if they're proper, fine, but just to nit–pick is getting a little onerous.

Mr. Withers: Your Honor, I'm not nit–picking.

The Court: Restate the question."

Record at 2043–44. After several more questions had been asked and answered, the following exchange occurred:

"Mr. Withers: I'd like to approach the bench for a minute please.

The Court: All right.

[At this point, a conversation was held at the bench outside the hearing of the jury and not a part of this record.]

The Court: I'll make a statement to the jury. Counsel has indicated that he is disturbed at the Court making a statement about nit–picking. I'm talking about phraseology. The witness was asked to state to the best of her ability, and that is a fairly good question when you're recalling past conversation. And that's the reason that I made the statement, and your objections are mainly going to phraseology, [when] the question is proper. And if the Court was proper in in using the term 'nit–picking' that's what it was meant to be. I think counsel understood exactly what I was talking about.

Mr. Withers: Your Honor, I think I'm [conversant] with the rules of evidence, and I thought I had made objections, and I am a little disturbed that I . . .

The Court: Your point is well–taken.

Mr. Withers: All right.

The Court: Continue."

Record at 2045–46. The record reveals that nothing further was said about this incident. Apparently counsel was satisfied with the court's handling of the issue, because the record does not reflect that counsel moved for a mistrial or requested that the jury be instructed or admonished to disregard any of the exchange between the court and counsel. *See Goodpaster v. State,* (1980) Ind., 402 N.E.2d 1239, 1241.

While the court's reference to "nit–picking" was probably not good judgment, we do not believe the remark was so prejudicial that appellant was denied a fair trial. This remark was part of only one isolated exchange between court and counsel, and ap-

pellant has not shown that he was placed in a position of grave peril by the court's comment. *Faught v. State,* (1979) Ind., 390 N.E.2d 1011, 1015; *Dewey v. State,* (1976) 264 Ind. 403, 409–10, 345 N.E.2d 842, 847. We find no error on this issue.

VIII.

Finally, appellant challenges the sufficiency of the evidence. In support of this challenge, appellant presents three basic arguments. First, he contends his alibi evidence stood unrebutted by the State and was corroborated by other witnesses. Second, he claims the key prosecution witnesses were convicted felons and, therefore, presented testimony which was not worthy of belief. Third, he claims that his conviction was the product of acts of perjury by these witnesses.

■ Appellant's arguments on this issue fail to recognize our well–established standards of review on issues of this type. As we have said many times, we will neither reweigh the evidence nor judge the credibility of witnesses. These tasks were for the jury to perform in discharging their function as trier of fact. *E.g., Woodford v. State,* (1980) Ind., 405 N.E.2d 522, 526; *Riggenbach v. State,* (1979) Ind., 397 N.E.2d 953, 956; *Taggart v. State,* (1979) Ind., 390 N.E.2d 657, 659. In so doing, the jury may believe or disbelieve whomever they choose. *E.g., Lock v. State,* (1980) Ind., 403 N.E.2d 1360, 1373; *Sypniewski v. State,* (1977) 267 Ind. 224, 232, 368 N.E.2d 1359, 1364. In reviewing a claim of insufficient evidence, this Court will determine only if there is substantial evidence of probative value from which the jury could have found appellant guilty beyond a reasonable doubt. *E.g., Ashbaugh v. State,* (1980) Ind., 400 N.E.2d 767, 775; *Willard v. State,* (1980) Ind., 400 N.E.2d 151, 160; *Ruetz v. State,* (1977) 268 Ind. 42, 49, 373 N.E.2d 152, 156.

The evidence in this case, some of which having been recited earlier in this opinion, shows that appellant Lawson attempted on several occasions to hire several people to kill David Bush. In fact, Lawson paid mon-

ey to some in furtherance of his plan. Lawson took two of these people to a vacant wooded lot near Bush's home and showed them how to get to the house. He also gave one person a key to Bush's residence. Lawson also showed them a diagram of Bush's house, and suggested that whoever killed Bush should scatter quantities of cocaine about the house to make the killing appear to be drug–related.

Further, the evidence shows that Lawson purchased three pistols on different occasions prior to the killing. At the time of one of the purchases, he asked the seller how to make a silencer for the weapon. While Lawson did go to his place of employment on the night of the killing, testimony established that Lawson could have left the job during his dinner hour, and that the approximate time of Bush's death coincided closely with Lawson's dinner hour. Moreover, no witness could affirmatively state the Lawson had been on the work premises during the entire evening. Lawson also threatened to kill Bush on at least two occasions prior to the murder, and told his step–daughter, Sandy, that she might be killed along with Bush. Thereafter, Sandy did, in fact, find a loaded gun in appellant's car. He also told Sandy that he could easily slip in and out of the factory without being noticed.

■ The evidence also clearly established a motive on Lawson's part for killing David Bush. The decedent was the first man whom Sandy Lawson continued to keep company with after her step–father had tried to force an end to the relationship. The evidence showed Lawson's sexual and unusually strong emotional feelings for Sandy. Evidence of a motive is, of course, entirely admissible and probative on the issue of the defendant's guilt. *E.g., Quinn v. State*, (1976) 265 Ind. 545, 356 N.E.2d 1186. Finally, appellant Lawson admitted to his cellmate in jail, witness Paul Baisden, that he had killed Bush. He explained to Baisden that he had done so by leaving the factory during his shift. Baisden also testified that Lawson offered and attempted to help him break out of jail, with the understanding that Baisden would then kill Sandy Lawson. We think there is substantial evidence of probative value from which the jury could have found Lawson guilty beyond a reasonable doubt.

Finding no reversible error, we affirm the judgment of the trial court.

GIVAN, C. J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.