**Lois Ann THACKER, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 1285 S 506.**

Supreme Court of Indiana.

July 23, 1990.

Alphonso Manns, Bloomington, for appellant.

Linley E. Pearson, Atty. Gen., Cheryl L. Greiner, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Appellant was charged in Count I pursuant to I.C. 35–42–1–1(1) with the knowing killing of her husband, John E. Thacker, by shooting. In a separate Count II, the prosecution sought the sentence of death by alleging pursuant to I.C. 35–50–2–9(b)(3) the aggravating circumstance that the killing had been accomplished while lying in wait. The trial court permitted Count II to be amended by adding a second aggravating circumstance pursuant to I.C. 35–50–2–9(b)(5) that the killing had been done by one Donald Ray Buchanan, Jr., who had been hired by appellant to do so.

A trial by jury resulted in a verdict of guilty as charged in Count I. A judgment of conviction was then entered on the verdict. The following day, the jury reconvened for the penalty phase of the trial. Following the presentation of evidence, the jury retired and then returned a verdict recommending that the death penalty be imposed.

The cause next came on for sentencing. The trial court expressly found that the State had proved both aggravating circumstances beyond a reasonable doubt. The Court further concluded that the mitigating circumstances were outweighed by the two aggravating circumstances and ordered death.

The evidence on behalf of the State is in substance as follows: During a period of several weeks, appellant spoke with three young men, Buchanan, Music and Hart, expressing her desire to have her husband, John Thacker, killed and encouraging and challenging each to do so. Her husband had a life insurance policy of which she was beneficiary. There was conflict between husband and wife. She formulated a plan and guided its execution, demanding that he be killed by shooting with a shotgun loaded with deer slugs, providing some ammunition, picking out for the trio a location along a road near their residence on which her husband drove and where he might be stopped and killed without notice, and directing that his wallet be taken following the assault because it contained an important paper.

One night, the three joined appellant at her trailer. She requested that her husband be killed that night, and one of the three said that it would be done. The trio then left her trailer and drove from it a short distance up a hill to the site along the road which had been previously pointed out by appellant, where, armed, they put a log across the road, hid, and waited for John Thacker to come along. He drove up in his truck and stopped to remove the log. He was then shot and killed by Music. Buchanan removed his wallet. Two of the

men returned to appellant's trailer, reporting to appellant their act and delivering the wallet. She then received some shotgun shells from them, which she put into the trash. She provided one of the men with a change of clothing and put his mud-stained clothes into her washing machine.

## I.

In the first of ten appellate claims, appellant contends that the trial court erred when permitting the State to amend Count II, death penalty, by adding to such count the allegation of murder by hire as a second aggravating circumstance. The person alleged to have been hired was Buchanan. I.C. 35–50–2–9(b)(5) sets forth such aggravating circumstance as, "The defendant committed the murder by hiring another person to kill." The initial Count II was based upon the single aggravating circumstance of murder by lying in wait. I.C. 35–50–2–9(b)(3) sets forth such aggravating circumstance as, "The defendant committed the murder by lying in wait."

The initial Count II, death penalty, was filed with the original information on November 5, 1984. At a pre-trial conference on February 7, 1985, the case was set for trial to commence on April 30. The voir dire examination of prospective jurors commenced on April 30 and was completed on May 9. On May 2, in the midst of voir dire, the State filed its amended version of Count II. The court refused to permit some amendments to be made, but subsequently permitted the one adding the allegation of the aggravating circumstance of hiring another person to kill, over a defense objection.

The accused in a criminal prosecution has a basic right to reasonable notice and a fair opportunity to be heard and to contest outright charges, recidivist charges, and death penalty charges. *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *Daniels v. State* (1983), Ind., 453 N.E.2d 160; *Barnett v. State* (1981), Ind., 429 N.E.2d 625. The amendment of an information to add an additional such charge is permitted and is governed by I.C. 35–34–1–5(c). *Hutchinson v. State*

(1983), Ind., 452 N.E.2d 955. Such an amendment, including one adding an additional aggravating circumstance for imposition of the death penalty, may be approved at any time so long as it does not prejudice the substantial rights of the defendant. *Williams v. State* (1982), Ind., 430 N.E.2d 759, *appeal dismissed*, 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47, *reh'g denied*, 459 U.S. 1059, 103 S.Ct. 479, 74 L.Ed.2d 626.

In this case, appellant was confronted with the new allegation of having hired Buchanan to kill her husband in the middle of voir dire examination of prospective jurors after having exercised some, but not all, of her peremptory challenges. Thus appellant claims prejudice to her right to peremptory challenges in that she was required to exercise some without knowledge of the second allegation.

According to I.C. 35–37–1–3(a), the defendant in a capital case is granted twenty peremptory challenges. The record shows that appellant exercised three such challenges prior to the filing of the amended information by the State. Thus, many peremptory challenges remained after the defense was aware of the new allegation. The record also discloses that Buchanan, the party allegedly hired by appellant, had been listed as a witness by the State. The State took his deposition on February 15, 1985, and continued with two additional sessions on February 20 and April 18, to completion. Thus, appellant was provided with an opportunity to know before commencing voir dire examination on April 30 that she would be faced with the testimony of Buchanan. Moreover, sixteen days elapsed between the filing of the amended information and the commencement of the trial on the death count. These days were available to the defense to develop a strategy to contest the new allegation.

Upon consideration of all the circumstances presented which tend to place this amendment in perspective, we find that there is no sufficient showing that substantial rights were prejudiced or that an impingement of due process occurred. There was no error.

## II.

■ It is next claimed that the trial court erred by excusing for cause several jurors during voir dire of the jury panel because of their views on the death penalty. The Sixth Amendment requires that "if prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out." *Adams v. Texas*, 448 U.S. 38, 48, 100 S.Ct. 2521, 2528, 65 L.Ed.2d 581, 591 (1980) (citing *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)). In reviewing whether a prospective juror was properly excluded, the totality of the questioning is to be considered. *Davis v. State* (1986), Ind., 487 N.E.2d 817. The *Witherspoon* doctrine applies to jury selection for capital cases in Indiana, where the jury recommends the death sentence to the judge and does not set it. *Burris v. State* (1984), Ind., 465 N.E.2d 171, *cert. denied*, 469 U.S. 1132, 105 S.Ct. 816, 83 L.Ed.2d 809 (1985); *Monserrate v. State* (1971), 256 Ind. 623, 271 N.E.2d 420. Where the jury selection standards employed by the trial court are not in accordance with the *Witherspoon* doctrine, a reversal of the sentence is required, and the conviction may stand unaltered. *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Monserrate*, 256 Ind. 623, 271 N.E.2d 420.

■ The jury here recommended that death be imposed. We therefore turn to decide whether the exclusion of prospective jurors in the present case violated the *Witherspoon* doctrine. Of the fifteen prospective jurors successfully challenged for cause on the basis of their views regarding the death penalty, the questioning of two defines the range of responses of the group. The most equivocal of the group ended his questioning by counsel and the court as follows:

> Judge Songer: .... The key question then is can you consider administering [the death penalty]?
> A: I could consider it, I'm answering truthfully, I guess I could.

Judge Songer: .... "Under no circumstances could I recommend to the judge that the death penalty be imposed?"
A. I lean toward that direction. I feel under no circumstances. That's what I would have to answer truthfully.

The least equivocal of the group finally responded as follows:

> Judge Songer: .... You're saying that under no circumstances could you consider recommending the death penalty?
> A: Right.

In all instances, the trial court received such responses and sustained a challenge by the prosecution for cause over the objection of defense counsel.

Each of these jurors was excluded in a manner consistent with the requirements of the Sixth Amendment if he or she held views which would prevent or substantially impair the performance of his or her duties as a juror in conformity with the oath and the jury instructions. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The voir dire examination of these prospective jurors commenced with a general expression that they had troubles with the death penalty. There was early ambiguity in their testimony, as they learned more about the process. Each, however, concluded with statements in the nature of those quoted above. In each instance, the record of voir dire examination provides a basis upon which the judge was warranted in concluding that the individual held moral, religious or ethical views which would have prevented or substantially impaired his or her ability to find and evaluate aggravating and mitigating circumstances and to make a recommendation as contemplated by the death sentence statute. Consequently, the claim that the trial court incorrectly sustained the challenges of the prosecution for cause is not sustained.

## III.

■ Appellant made a pre-trial motion in limine and in-trial objections to the testimony of prosecution witnesses from which it might be deduced that appellant and the victim Thacker had shot and killed appellant's first husband, Phillip Huff, in 1983,

about two years before the 1984 shooting death of Thacker. The trial court overruled both, ruling that the challenged evidence was admissible as part of the res gestae of the charged crime of killing Thacker.

Evidence of separate offenses committed by the accused is generally inadmissible. *Maldonado v. State* (1976), 265 Ind. 492, 355 N.E.2d 843. Evidence tending merely to prove that the accused has a bad character or criminal propensity is totally inadmissible. *Randolph v. State* (1977), 266 Ind. 179, 361 N.E.2d 900. However, we have recognized that " 'happenings near in time and place' which 'complete the story of the crime on trial by proving its immediate context' " (sometimes referred to as res gestae) are properly proved. *Maldonado,* 265 Ind. at 495, 355 N.E.2d at 847 (quoting *McCormick on Evidence* § 190 at 448 (2d ed. 1972)). Connie Busick, testifying on behalf of the State, testified that when charting the plan to kill Thacker, appellant said she wanted Buchanan to kill Thacker with a deer slug, the same means she and Thacker had used to kill Huff. Matthew Music testified that on the night of the shooting of Thacker, appellant asked him whether he was going to help kill Thacker and that when he said no, she told him that Thacker had killed Huff, who had been Music's best friend. The other evidence challenged on this basis was of like nature. At various stages of the trial, the trial court responded to such evidence by instructing the jury not to consider such matters pertaining to the death of Huff as evidence of appellant's guilt of the charged crime.

These incriminating statements attributed to appellant by the various witnesses were made in the formulation of the plan to kill Thacker and during her efforts to induce others to execute the plan. Their relevance was of the highest order and outweighed their prejudicial value, especially in light of the portrayal of Thacker as more culpable for Huff's death than appellant and the trial court's admonitions to the jury to give the statements limited consideration. The trial court properly permitted this evidence to be presented, despite its tendency to show that appellant had been an accomplice in a prior crime.

## IV.

 State's exhibits 4 and 5 are color photographs depicting two fatal gunshot wounds to the body of the victim Thacker. The photos are of the naked body of the victim after it had been cleaned in preparation for an autopsy. Exhibit 4 depicts the upper portion of the back of the victim and shows an oval hole, measuring one and one-half inch by one inch. Exhibit 5 depicts the head of the victim, in frontal view, against a clean, white porcelain background. The left eye, left temple, and upper left side of the head and skull are simply missing. There is little blood or internal structures of the skull showing. No part of the brain is visible. There are no autopsy marks.

Appellant objected to the admission of exhibit 5. The objection was overruled. On appeal, the claim is made that this ruling was error in that it was cumulative of the testimony of the pathologist when using a model of the head and that its relevance was outweighed by its tendency to inflame and impassion the jury against the defendant. In *Kiefer v. State* (1958), 239 Ind. 103, 153 N.E.2d 899, *cert. denied,* 366 U.S. 914, 81 S.Ct. 1089, 6 L.Ed.2d 238 (1961), five of six photographs of the body of the deceased admitted at trial were admitted over objection. Three were held properly admitted as they served to "elucidate and explain relevant oral testimony given at the trial and they were properly admitted for the purpose of showing fully the scene of the crime, the nature of the wounds of the victim, and the condition of the basement immediately after the crime was committed." *Id.* at 108, 153 N.E.2d at 900. Two were held improperly admitted. They depicted the hands and instruments of the pathologist inside the chest cavity of the deceased during an autopsy. Such photographs were condemned because their tendency to enlighten the jury was dubious, while their tendency to arouse sympathy for the victim and indignation against the accused was great.

We conclude that exhibit 5 does not fall within the class of those deemed inadmissible under *Kiefer*. The restraint of the prosecution in presenting this photograph is apparent. It stands alone as a close-up photograph of the head. The facial appearance is quite normal, despite the absent portion. It is relevant on the issue of identification. There are no signs of cutting or alteration by the pathologists, and no instruments are present. A side view of the head in a photograph would have been equally accurate, but would have had a much greater tendency to prejudice the ability of the jury to make dispassionate determinations of fact. Exhibit 5 accurately showed the nature and extent of the deceased's wound to the head, and it portrayed the wound in the manner least calculated to arouse sympathy and indignation. It was not unduly gruesome or prejudicial and was properly admitted.

### V.

■ The defense proffered its proposed final instruction No. 6, intended for use at the guilt-innocence stage of the trial. The essential character of that feature of the instruction tending to restrain deliberations to the benefit of the defense is to be gleaned from the admonitions in the instruction that the jury "should not be swayed by any undue demand for conviction by the State" and that it should "put aside any consideration of public approval or disapproval." The trial court rejected the instruction on the basis that its subject was sufficiently covered by other instructions which were given.

In resolving this claim, it is not necessary for us to determine the correctness of this tendered instruction. It is sufficient if it be determined that such instruction was covered by other instructions. *New v. State* (1970), 254 Ind. 307, 259 N.E.2d 696. Several instructions restrained the jury to a consideration of the evidence presented at trial in determining guilt, which by necessary intendment prohibited consideration of information and opinions from other sources and consideration of the publicity and public interest surrounding the trial. One of the court's instructions contained an express prohibition against being influenced by sympathy for the victim and prejudice against the defendant. The substance of this defense instruction was presented to the jury in appropriate fashion in other instructions and, therefore, there was no error in the refusal to give it.

### VI.

■ The defense proffered its proposed final instruction Nos. 7, 8, 9, 10, 11, and 12, to be given to the jury at the guilt-innocence stage of the trial. The purpose of these instructions was to permit the jury to find appellant guilty of the offense of assisting a criminal, rather than murder. The trial court refused the instructions, ruling that such offense was not a lesser included offense of murder.

One who harbors, conceals or otherwise assists a person who has committed a crime, while intending to hinder the capture or punishment of such person, is guilty of assisting a criminal. I.C. 35–44–3–2. One who knowingly or intentionally aids, induces or causes another person to kill is guilty of murder. I.C. 35–42–1–1; I.C. 35–41–2–4. The charge here was knowingly killing a man by shooting him. It is apparent from a comparison of the statutes that one who aids, induces or causes another to commit murder has not necessarily assisted any person in avoiding detection and arrest, and that the latter is not a necessary lesser and included offense within the former, from the statutory viewpoint. The jury was instructed that appellant could be guilty of murder if she aided, induced or caused others to kill, such conduct necessarily occurring during the events leading up to and including the act of killing. The charge did not allege conduct that would have constituted the separate offense of assisting a criminal, and therefore assisting a criminal was not a lesser and included offense of murder from the standpoint of the allegations in the information. *Reynolds v. State* (1984), Ind., 460 N.E.2d 506. Since the proposed lesser included offense was not included within the charge, it did not qualify for inclusion in a jury instruction as an alternative to murder, despite

the fact that there was abundant evidence at trial of her conduct and state of mind when helping Buchanan and Music after the death of Thacker which would have supported a conviction for such proposed offense.

In *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the United States Supreme Court held that, as a matter of due process, the benefit of lesser included offense law must be extended to those facing capital charges on the same basis that it is extended to those facing non-capital charges. Here, the offense of assisting a criminal is not a lesser included offense of the charged crime of murder, and this same legal conclusion would follow if this were not a capital case. Appellant testified that she was not involved in the planning and plotting to kill Thacker and denied helping Buchanan and Music later with knowledge of the fact that they had shot him. This testimony created a conflict for resolution by the trier of fact. It did not require the proposed defense instructions on the lesser uncharged crime of assisting a criminal as a matter of due process.

## VII.

Appellant was charged outright by information with the unlawful shooting and killing of Thacker at a particular point along a roadway. She filed a notice of alibi, asserting that she was in her home at the time of the death. The State did not file a response, and the evidence at trial, without exception, placed her in her home at the time of his shooting and death on the roadway. She was convicted through final jury instruction Nos. 3 and 4 upon the theory that she aided, induced or caused other persons to commit the offense. Appellant claims that the charge did not provide her with due notice of the nature of the accusation against her in violation of the Sixth Amendment and Article 1, § 13 of the Indiana Constitution.

In the former statute defining accessory after the fact, it was declared that "[e]very person who shall aid or abet in the commission of a felony, . . . or procure a felony to be committed, may be charged[,] . . . tried and convicted in the same manner as if he were a principal. . . ." I.C. 35–1–29–1 (Burns 1975). This statute was repealed by the time of appellant's offense and replaced by I.C. 35–41–2–4, which declares that "[a] person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense. . . ." Aiding, inducing or causing an offense is not a separate offense under this newer statute, but is, in fact, the basis of liability for the underlying offense, in this case, murder. *Hammers v. State* (1987), Ind., 502 N.E.2d 1339. Despite the omission of any reference to the manner of bringing a charge in this newer statute, this Court has continued to sanction bringing the charge as though the accused were a principal, *Harris v. State* (1981), Ind., 425 N.E.2d 154, and has not required the charging instrument to contain special references to conduct, remote in place or time from the place or time of the actual consummation of the crime, which one might deem to be acts of aiding, inducing, or causing the crime, rather than acts of actual participation. It has, however, become common practice to allege specific acts of aiding and inducing in the charging instrument. *See Whitehead v. State* (1986), Ind., 500 N.E.2d 149. In *Lawson v. State* (1980), 274 Ind. 419, 412 N.E.2d 759, *cert. denied*, 452 U.S. 919, 101 S.Ct. 3057, 69 L.Ed.2d 424 (1981), this Court sought out and found that an express notice was given the accused of the prosecutor's intention to proceed upon a theory of accessory liability in the prosecutor's response to the defendant's notice of alibi. Here, by contrast, there was no such notice. There was, however, an equivalent thereof in the pre-trial proceedings when appellant became aware that others were charged with the same crime, when the trial judge at arraignment read to appellant the murder statute and I.C. 35–41–2–4, the aiding and causing statute, and when, during voir dire examination of the jury, the State amended the death count to include an allegation that appellant had hired Buchanan to commit the murder. These events placed appellant on notice of the prosecution's intent to proceed on a theory

sanctioned by I.C. 35–41–2–4. There was therefore no error in giving instruction Nos. 3 and 4 on that theory.

## VIII.

Appellant next claims that the evidence of guilt was wholly insufficient to support the jury verdict. In determining this question, we do not weigh the evidence nor resolve questions of credibility, but look to the evidence and reasonable inferences therefrom which support the verdict. *Smith v. State* (1970), 254 Ind. 401, 260 N.E.2d 558. The conviction will be affirmed if, from that viewpoint, there is evidence of probative value from which a reasonable trier of fact could infer that appellant was guilty beyond a reasonable doubt. *Bruce v. State* (1978), 268 Ind. 180, 375 N.E.2d 1042, *cert. denied,* 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662.

The charge was founded on the legal rule supplied by I.C. 35–41–2–4, that one who causes another to commit an offense is guilty of committing that offense. Such rule imposes a form of vicarious liability, rather than liability based upon physical participation in the direct and immediate acts which constitute the offense itself. *Kappos v. State* (1984), Ind., 465 N.E.2d 1092. In order to prove the crime of murder upon the basis of this legal theory, the State would have to prove that:

 (1) appellant;

 (2) knowingly or intentionally;

 (3) Induced;

 (4) Another person;

 (5) To kill a human being.

The evidence summarized at the beginning of this opinion was provided by appellant's sister, Busick, and Buchanan, Hart and Music, all of whom testified pursuant to plea agreements or expectation of leniency. Their testimony provided the basis for the trier of fact to infer to a moral certainty beyond a reasonable doubt that appellant created the plan to kill, recruited Buchanan, Hart and Music to execute the plan, offered them incentives to execute the plan, and that the three agreed to execute the plan and did so.

Appellant first offered Buchanan money to find someone to kill Thacker, and when he failed, directly offered him money to do it. Buchanan agreed. He was present and assisted in the ambush and also took the victim's wallet. Buchanan was the boyfriend of appellant's younger sister, Busick.

Hart was asked by Buchanan to kill Thacker, and Hart was present when appellant offered to pay both him and Buchanan. Hart did not reply verbally, but showed his agreement by immediately procuring a shotgun with which to commit the killing. Hart drove the three to the crime scene, helped place the log across the road, and stood by as the ambush occurred. Hart was a friend of Buchanan.

Music was asked by appellant on October 31, November 1, and the night of the crime, November 2, to kill Thacker. On the first occasion, he refused. On the second occasion, he was in appellant's trailer with Buchanan and Hart. He at first refused, then appellant taunted him, calling him and the others "chicken shit," and then he and the others agreed. They left the trailer, Hart and Music armed, and waited up the road for Thacker to drive by. When he did, they raised their weapons, but Buchanan said for them not to fire, and they did not. Music was appellant's cousin.

The next night, the same three were gathered in appellant's trailer and she again asked them to kill Thacker and cajoled them as previously. She then told Music that Thacker had killed her first husband, Huff, who had been one of Music's best friends. This angered Music, and he agreed again to participate in the plan. The three men again departed the trailer, went about 500 feet up the road, and hid at the chosen spot. They blocked the road with a log and waited. Thacker came along, stopped, got out and moved the log. Music alone was armed, and he actually shot Thacker as the other two watched. Appellant had previously chosen the type of shotgun shells to be used in the killing, bought them, and given them to Buchanan. She likewise had chosen the location along the road at which the trap was to be

sprung. The character of this evidence is such that from it, a reasonable trier of fact could conclude to a moral certainty beyond a reasonable doubt, that appellant knowingly and intentionally, through a mixture of devices, aided, induced and caused the three men to ambush, shoot and kill her husband.

■ Appellant challenged the four main witnesses against her, citing several examples of their testimony which are argued as demonstrative of their inherently improbable and coerced nature. All testified pursuant to plea agreements or with an expectation of leniency. All admitted having previously lied, having previously made inconsistent statements, and having been drug abusers. Busick testified that she had become pregnant by both Huff and Thacker and that she had previously made false statements, and her testimony supplied the basis for the inference that she was very gullible and under the control of a particular police officer for whom she had served as an informant. Busick was confused about the dates of several of the events surrounding the crime. Similar challenges are made against the witnesses Buchanan, Hart and Music.

In *Rodgers v. State* (1981), Ind., 422 N.E.2d 1211, this Court through Justice Hunter wrote:

> Defendant's contention strikes directly at the credibility of the witnesses, a matter which with rare exceptions is solely the province of the jury. Only when this Court has confronted "inherently improbable" testimony, or coerced, equivocal, wholly uncorroborated testimony of "incredible dubiosity," have we impinged on a jury's responsibility to judge the credibility of witnesses.

*Id.* at 1213 (citations omitted). The factors cited by appellant in her brief certainly diminish the credibility of the prosecution witnesses and the weight which one might reasonably give their testimony. However, at its core, the body of testimony of these witnesses is in accord, and not contrary to natural laws or human experience. We find the evidence sufficient to convict.

## IX.

Appellant next claims that the evidence serving to support the penalty of death was insufficient.

## A.

■ Count II of the information specified that the death penalty was being sought upon the basis of I.C. 35–50–2–9(b)(3), which provides:

> (b) The aggravating circumstances are as follows:
>
> . . . .
>
> (3) The defendant committed the murder by lying in wait.

Appellant was convicted of murder. This conviction placed her in a class subject to the death penalty. I.C. 35–50–2–9(a). This class includes those who, like appellant, are guilty of murder as an accessory or accomplice. *Brewer v. State* (1981), 275 Ind. 338, 417 N.E.2d 889, *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384, *reh'g denied*, 458 U.S. 1132, 103 S.Ct. 18, 73 L.Ed.2d 1403 (1982). The finding of the trial judge that appellant committed this murder by lying in wait, an aggravating circumstance enumerated in the death sentence statute, placed her in a sub-class of those convicted of murder, namely, those convicted of murder and subject to the death sentencing process involving the weighing of aggravating and mitigating circumstances. This Court recently held that this sub-class includes those who intentionally kill when acting as an accomplice or accessory in one of the enumerated felonies in I.C. 35–50–2–9(b)(1). *Lowery v. State* (1989), Ind., 547 N.E.2d 1046 (DeBruler, J., concurring and dissenting). The question presented here is whether appellant was properly placed in this sub-class by reason of the aggravator provided for in I.C. 35–50–2–9(b)(3).

■ The special elements constituting a murder by lying in wait are watching, waiting and concealment from the person killed with the intent to kill or inflict bodily injury upon that person. *Davis v. State* (1985), Ind., 477 N.E.2d 889, *cert. denied*, 474 U.S. 1014, 106 S.Ct. 546, 88 L.Ed.2d 475. In such a crime, there is considerable time

expended in planning, stealth and anticipation of the appearance of the victim while poised and ready to commit an act of killing. Then, when the preparatory steps of the plan have been taken and the victim arrives and is presented with a diminished capacity to employ defenses, the final choice in the reality of the moment is made to act and kill. This aggravating circumstance serves to identify the mind undeterred by contemplation of an ultimate act of violence against a human being and, of equal importance, the mind capable of choosing to commit that act upon the appearance of the victim. We therefore construe this statutory aggravator as intending to identify as deserving consideration for the penalty of death those who engage in conduct constituting watching, waiting and concealment with the intent to kill, and then choosing to participate in the ambush upon the arrival of the intended victim.

 The evidence here is clear and uncontradicted in placing appellant inside her trailer at the moment of the killing. She remained in the trailer when the three young men left. They stationed themselves in the woods along the road at a point 500 feet from the trailer, where they watched, waited and concealed themselves from the victim with the intent to kill him, and when he arrived at the spot, they acted on their intention and did kill him. While appellant planned and desired that the crime be committed by lying in wait, and caused others to commit the crime as planned, she was not at the crime scene and did not make that required choice to participate in the attack upon the arrival of the victim. Consequently, while her conduct warrants a conviction for murder as an accomplice or accessory, it does not place her in a category subject to the death sentencing process through the aggravating circumstance of committing a murder by lying in wait. The evidence of this statutory aggravator, properly construed, is insufficient.

### B.

 Count II of the information also called for the sentence of death to be given on the basis of the aggravating circumstance set forth in I.C. 35–50–2–9(b)(5), which provides:

(b) The aggravating circumstances are as follows:

. . . .

(5) The defendant committed the murder by hiring another person to kill.

The trial court found that this aggravating circumstance was proved beyond a reasonable doubt. The information alleged that appellant committed the murder by hiring Buchanan to kill Thacker.

The evidence demonstrates that appellant procured the killing of her husband by three persons: Buchanan, Hart and Music. Buchanan testified at trial and described the first relevant contact with appellant which occurred several weeks before the killing:

Q. Just you and Lois and what did she say?

A. She just come up to me and asked me if I know [sic] anybody would kill her husband.

Buchanan made no response to appellant's first inquiry. Buchanan described a later second contact:

Q. What did she—what did the rest of the conversation?

A. She said If I found somebody that she'd pay them and she would buy a rig for me to drive.

Q. Do you remember telling her how much it cost?

A. I said about eighty thousand dollars ($80,000).

Buchanan then described a meeting in a city park with appellant. Hart was then present. It took place on November 1, the day before the killing.

Q. And what did she say?

A. She asked me if I'd do it. She'd give me and James Hart a thousand dollars each if we'd do it.

Q. So you—what did you say when she offered you the thousand dollars each?

Q. And who was responding to her?

A. Me and James.

Buchanan agreed verbally. At the close of this meeting, Hart went off and got a gun from his brother to commit the killing. At trial, Hart testified about this meeting in the following manner:

Q. Now if D.J. [Buchanan] says you were offered a thousand dollars to kill John Thacker, would that be right or wrong?

A. I hear[d] Lois talking about money but as far as her coming to me and saying, "I'll give you money to kill him", no.

Q. Did D.J. ever offer you money to help?

A. No.

That night, Buchanan, Hart and Music gathered at appellant's trailer. There is no evidence at all that Music was ever offered money or benefit to kill, or that money or compensation was mentioned at all on this occasion. When asked by appellant to help, Music, who was appellant's cousin, refused. Appellant then repeatedly called them chicken shit and told Music that her husband, John Thacker, had shown some interest in his girlfriend. This motivated Music, and all three then left the trailer, agreeing to kill Thacker. Hart and Music armed themselves and hid alongside the road at the point of ambush. Hart and Music raised their weapons when the victim drove by, but Buchanan said not to shoot, and they did not. The three then agreed to tell appellant that there had been a car following the victim and that this was the reason they did not shoot.

The next night, the three again gathered at appellant's trailer. No mention of money or compensation was made. Appellant hazed the three again, calling them chicken shit. She then took Music aside and told him that her husband, John Thacker, had killed her first husband, Huff. Huff had been a good friend of Music, and the new information enraged him, and he agreed to shoot Thacker. The three men left again. Buchanan said that he did not have the courage to shoot Thacker. This time, only Music was armed. The three concealed themselves along the road. When Thacker arrived, Music shot him once from conceal-

ment and a second time at close range as he lay in the roadway.

In *Norton v. State* (1980), 273 Ind. 635, 408 N.E.2d 514, the Court interpreted a prior version of the homicide statute which proscribed the killing with purpose and malice "by a person hired to kill." I.C. 35–13–4–1 (Burns 1975). There, this Court concluded that a murder for hire has been committed when one offers or promises compensation to another for performing a killing, and the other person commits the murder pursuant to or in response to this offer or promise.

This aggravating circumstance is applicable when the defendant has been successful in locating and persuading another person to kill for pecuniary gain. The will, capacity and facility for doing so, identifies the person deemed here by legislative intent to be deserving of consideration for the death sentence.

Not one, but three young men participated in this homicide. Appellant's representations to each was different, and their motivations were different. Buchanan was offered money and agreed, yet he was reluctant until repeatedly called a coward by appellant, his girlfriend's older sister. Thus, with this mixed motive, he led the group up the road on the first night. He was not armed and, when the victim appeared, he called for the others not to shoot. The next night, he declared that he did not have the courage to kill the victim; however, when again challenged as a coward by appellant, he agreed to go, but again did not arm himself.

The evidence that Hart engaged in either the first aborted ambush or the second successful one in expectation of compensation is insufficient. He was a long-time friend of Buchanan and was first asked by Buchanan to help. Buchanan did not offer him money. The offers of money to both was made by appellant to Buchanan in Hart's presence. Buchanan accepted the offer verbally, and Hart indicated his agreement through his conduct in advancement of the plan. He did not respond verbally to this offer. He testified as a witness for the prosecution that the conver-

sation created no expectation in him that he would receive any money and that he participated out of fear. On the occasion of the fatal shooting, he went to the scene and participated in preparing it to trap the victim, but did not arm himself.

The evidence that Music, the triggerman, was motivated because of an offer of compensation from appellant is non-existent. It is clear that he led the final ambush and was then motivated by appellant's hazing and his animosity toward John Thacker, the victim.

It is evident that we would be stretching the language defining this aggravating circumstance beyond its intended meaning if we were to find the evidence sufficient to support the allegation that appellant committed this murder by hiring Buchanan or either of the other two to kill. On this analysis, we find the evidence of this second aggravating circumstance insufficient.

The judgment of conviction is affirmed. The sentence of death is vacated. This cause is remanded with instructions to enter the maximum prison sentence for murder provided for by law. *Cooper v. State* (1989), Ind., 540 N.E.2d 1216.

SHEPARD, C.J., and DICKSON, J., concur.

GIVAN, J., dissents with separate opinion.

PIVARNIK, J., dissents and joins in the opinion of GIVAN, J.

GIVAN, Justice, dissenting.

I respectfully dissent from the majority opinion in the setting aside of the death penalty. The first reason given by the majority opinion is that there is insufficient proof that appellant was guilty of lying in wait to kill the decedent.

The majority cites the fact that appellant was in her trailer during the attack. However, the majority decision on this question is diametrically opposed to the correct findings in the early part of the opinion, which correctly hold that it is not necessary for appellant to have taken part directly in the murder as long as she planned and directed the execution of the same.

It is unnecessary for this dissent to reiterate the authority for that proposition of law as it is amply contained in the majority opinion. That evidence alone is sufficient to sustain the death penalty. However, the majority proceeds to find that there is no evidence that appellant hired the actual perpetrators of the murder but simply persuaded them to so act.

As observed by the majority opinion, there is direct evidence that Buchanan was offered money to accomplish the killing. There is ample circumstantial evidence in this record from which the jury could have determined that all three men understood that there was to be compensation for the killing. For the majority now to hold this evidence to be insufficient is purely a matter of weighing the facts which was the exclusive prerogative of the jury.

Even if it is to be conceded that there is insufficient evidence that money was to be paid to the perpetrators the evidence of lying in wait to commit the killing is without contradiction and correctly set forth in the majority opinion. I cannot join in the rationalization of the majority to set aside the death penalty.

I would affirm the trial court in all things.

PIVARNIK, J., concurs.