**Mark Shaun HALL and Christopher Hall, Appellants–Defendants,**

v.

**STATE of Indiana, Appellee.**

**No. 48A04–0209–CR–457.**

Court of Appeals of Indiana.

July 10, 2003.

Patrick R. Ragains, Anderson, IN, Attorney for Appellants.

STEVE CARTER, Attorney General of Indiana, GRANT H. CARLTON, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Following a jury trial, Appellant Christopher Hall ("Chris") was convicted of Cruelty to an Animal, a Class A misdemeanor, and Appellant Mark Shaun Hall ("Mark") was convicted of Cruelty to an Animal, a Class A misdemeanor, and Dealing in a Sawed-off Shotgun, a Class D felony. Upon appeal, the Halls present two issues for our review, which we consolidate and restate as whether the evidence is sufficient to support their convictions.

We affirm.

The facts favorable to the jury's verdict reveal that, while patrolling on December 30, 2000, Deputy Robert Olesky of the Madison County Sheriff's Department observed two men, later identified as the defendants, walking with long guns but not wearing "hunter orange" clothing. Concerned that the defendants might be in violation of hunting laws, Olesky pulled his patrol car to the side of the road and observed the defendants with binoculars. Chris was carrying a rifle and pointed it at something on the ground a short distance away, shooting approximately twenty times. Mark fired a shotgun twice, once at a short distance away and once at very close range, "pretty much just straight down towards its feet." Transcript at 30.

Olesky drove up to the defendants and discovered that they had been shooting at a cat. The cat had been hit numerous times and was dead. Olesky took posses-

sion of the rifle Chris had been using and eventually retrieved the shotgun from Mark as well, which was determined to be below the statutory minimum length. The State charged both defendants with Cruelty to an Animal and charged Mark with Dealing in a Sawed-off Shotgun. Following a jury trial held on June 6, 2002, both defendants were found guilty as charged. The trial court entered judgment on the convictions and sentenced Chris to one year suspended and to be served on probation. Mark was sentenced to three years incarceration, with six months executed and to be served in a work-release program and thirty months suspended and to be served on probation.

I

### Dealing in a Sawed-off Shotgun

Mark claims that the evidence is insufficient to support his conviction for Dealing in a Sawed-off Shotgun. The statute defining this offense states, "A person who ... gives, lends, or possesses ... any sawed-off shotgun commits dealing in a sawed-off shotgun, a Class D felony." Ind. Code § 35–47–5–4.1(a) (Burns Code Ed. Repl.1998). A "sawed-off shotgun" is defined as:

"(1) a shotgun having one (1) or more barrels less than eighteen (18) inches in length; and

(2) any weapon made from a shotgun (whether by alteration, modification, or otherwise) if the weapon as modified has an overall length of less than twenty-six (26) inches." Ind.Code § 35–47–1–10 (Burns Code Ed. Repl.1998).

A shotgun meeting either of these definitions is considered a sawed-off shotgun.[1]

---

1. A "shotgun" is statutorily defined as:     "a weapon designed or redesigned, made or

*Brook v. State,* 448 N.E.2d 1249, 1251 (Ind. Ct.App.1983).

In the present case, Mark does not deny that the shotgun he possessed was prohibited by the above-cited statute. He does, however, claim that despite the lack of a mens rea element in I.C. § 35–47–5–4.1, there must nevertheless be some showing that he knew that the weapon he possessed was contrary to the statute. The State counters that in *Brook,* 448 N.E.2d at 1252, this court held that the predecessor statute to I.C. § 35–47–5–4.1, Ind.Code § 35–23–9.1–2(a),[2] defined a crime of general rather than specific intent. The State therefore argues that it did not have to prove that Mark intentionally or knowingly possessed a sawed-off shotgun. Regardless, even if we were to accept the view that the State was somehow required to prove specific intent, the evidence reveals that Mark knew that the shotgun in his possession was not within the legal length restrictions. Officer Olesky testified that when he asked Mark why he had hidden the shotgun, Mark replied, " '[be]cause it's too short.' " Transcript at 36.

Mark also claims that the shotgun in his possession measured 25 7/8, which is only 1/8 below the legally permissible length. *See* I.C. § 35–47–1–10(2). Officer Olesky testified that the shotgun measured 25 1/2 and that the barrel was 13 1/2 in length. Thus, the barrel length was 4 1/2 below the legally permissible length. *See* I.C. § 35–47–1–10(1). Under either subsection

of I.C. § 35–47–1–10, Mark possessed a sawed-off shotgun, and possession of a sawed-off shotgun is sufficient to support a conviction for dealing in a sawed-off shotgun. *Brook,* 448 N.E.2d at 1251–52.

## II

### *Cruelty to an Animal*

■■■ The defendants claim that the evidence is insufficient to support their convictions for Cruelty to an Animal. The statute under which the defendants were charged reads in relevant part, "A person who knowingly or intentionally tortures, beats, or mutilates a vertebrate animal commits cruelty to an animal, a Class A misdemeanor." Ind.Code § 35–46–3–12(a) (Burns Code Ed. Repl.1998).[3] Here, Chris was charged as follows:

"On or about December 30, 2000, at a location in Madison County, State of Indiana, Christopher A. Hall did knowingly or intentionally mutilate a vertebrate animal, to-wit: by firing approximately thirty (30) projectiles from a shotgun into the body of a carcass of a cat until the cat was dead and its corpse mutilated." Appendix at 35.

Mark was charged with nearly identical language.

■■■ In one sentence, Chris claims that no evidence was presented at trial that he used a shotgun as alleged in the charging information. Indeed, the evi-

---

remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger." Ind.Code § 35–47–1–11 (Burns Code Ed. Repl.1998).

2. The relevant portions of both statutes are substantially the same.

3. This statute has since been amended to read in relevant part:

"A person who knowingly or intentionally beats a vertebrate animal commits cruelty to an animal, a Class A misdemeanor. However, the offense is a Class D felony if:
(1) the person has a previous, unrelated conviction under this section; or
(2) the person knowingly or intentionally tortures or mutilates a vertebrate animal." I.C. § 35–46–3–12(b) (Burns Code Ed. Supp.2002).

dence presented at trial revealed that Chris used a rifle whereas Mark used a shotgun. Although Chris develops this argument no further, we note that where there is an essential difference between proof and pleading, a variance exists. *Allen v. State*, 720 N.E.2d 707, 713 (Ind. 1999). However, not all variances require reversal. *Id.*

■ Here, there is no indication in the record that Chris objected to this variance at trial. Failure to make a specific objection at trial waives any material variance issue. *Bayes v. State*, 779 N.E.2d 77, 80 (Ind.Ct.App.2002), *trans. denied.* Chris also fails to explain exactly how he was misled by the alleged variance in the preparation and maintenance of his defense or how he was harmed or prejudiced thereby. *See Allen*, 720 N.E.2d at 713.

Although the information alleges the use of a shotgun and the proof adduced at trial was that Chris used a rifle, the means used to commit animal cruelty is not an element of the crime. *See* I.C. § 35–46–3–12. In addition, the weapons are not dissimilar in their propensity to wound or injure. We therefore conclude that any variance between the pleading and the proof in the present case does not require reversal. *See Mitchem v. State*, 685 N.E.2d 671 (Ind. 1997) (because the weapon used is not an element of attempted murder, it was unnecessary to allege which weapon was used, and no fatal variance existed where attempted murder charging information alleged defendant used shotgun and handgun, but proof adduced at trial was that defendant used a rifle, because all were firearms); *Madison v. State*, 234 Ind. 517, 130 N.E.2d 35 (1955) (no fatal variance where information was more specific than required by law in that information alleged use of hand grenade filled with nitroglycerine, but grenade was actually filled with T.N.T., because the weapon used was of a similar nature and caused the same character of wound or injury as weapon alleged) (Arterburn, J., concurring, joined by three other justices).

The same conclusion applies to the allegation that thirty projectiles hit the cat. The means used to mutilate the cat is not an element of the crime, and the defendants do not explain how they were misled by the alleged variance or how they were harmed or prejudiced thereby. Thus, any variance between the charging information and the proof in this manner is not fatal. We further note that the charging information does not, as the defendants argued at trial and upon appeal, allege that each defendant shot the cat thirty times. Instead, it alleges that thirty projectiles were fired into the cat. A typical shotgun shell fires more than one projectile with each shot. An allegation that thirty projectiles were fired into the cat is not inconsistent with evidence that Mark shot the cat twice with a shotgun. Also, despite the defendants' claims to the contrary, there was testimony that Chris fired the rifle approximately twenty times.

■ The defendants' main argument is that there is insufficient evidence that they mutilated the cat as charged. In support of this contention, the defendants cite *Boushehry v. State*, 648 N.E.2d 1174 (Ind.Ct. App.1995). In *Boushehry*, the defendant was charged and convicted of two counts of knowingly torturing or mutilating a Canadian goose resulting in the death of the goose. The facts leading to Boushehry's arrest and conviction were that he had instructed Jim Waugh to shoot geese. Waugh fired two or three shots from a .22 caliber rifle, killing one goose and wounding another. Boushehry then cut the wounded bird's throat to kill it.

Upon appeal, Boushehry claimed that there was insufficient evidence to establish that he or Waugh had either tortured or

mutilated either bird. The State countered that the act of shooting the geese constituted mutilation. The *Boushehry* court held that the act of shooting the goose which died instantly was insufficient to support a conviction for cruelty to an animal. Specifically, the court wrote:

> "One goose died instantly; there was no evidence presented at trial that either Boushehry or Waugh tortured or mutilated this goose in achieving its death. *The act of shooting the goose is not enough alone to establish cruelty to an animal by either torture or mutilation.* Because Boushehry was charged with only the torturing or mutilation death of the geese, his conviction for cruelty to an animal based on the death of the goose who died from the gunshot, absent evidence that the goose was tortured or mutilated, cannot stand." *Id.* at 1178 (emphasis supplied).

As to the conviction based upon the death of the other goose, the court held that the evidence was sufficient to support the conviction. The court held that Boushehry's act of slitting the wounded bird's throat "constituted mutilation in its plain, or ordinary and usual, sense." *Id.*

Because I.C. § 35–46–3–12 does not define "mutilate," we take the term in its plain, or ordinary and usual, sense. *Boushehry*, 648 N.E.2d at 1177–78; *Elisea v. State*, 777 N.E.2d 46, 48 (Ind.Ct.App.2002). Webster defines "mutilate" as "to cut off or permanently destroy a limb or essential part of . . ." and "to cut up or alter radically so as to make imperfect." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1493 (1966). *See also Elisea*, 777 N.E.2d at 48.

In the case at bar, the evidence most favorable to the conviction reveals that, unlike the first goose in *Boushehry*, the cat here did not die instantly; instead the cat was shot numerous times. Although shooting an animal once and killing it instantaneously does not constitute mutilation, here, the evidence most favorable to the verdict reveals that Chris shot at the cat approximately twenty times with a rifle, and Mark shot at the cat twice with a shotgun. Although there is no direct evidence on precisely how many times the cat was struck, the testimonial and photographic evidence reveals that the cat was hit multiple times. From this, a reasonable jury could conclude that the cat was mutilated, i.e., altered radically so as to be made imperfect. *See State v. Roberts*, 8 S.W.3d 124 (Mo.Ct.App.1999) (citing Webster's Third New International Dictionary in holding that the defendant's acts constituted "mutilation" as used in animal cruelty statute where defendant had beaten his dog until the dog's ribs were broken so that they cut and destroyed surrounding muscles and arteries), *trans. denied; State v. Stout*, 958 S.W.2d 32 (Mo.Ct.App.1997) (citing Webster's Ninth New Collegiate Dictionary in holding that defendant mutilated dog within meaning of animal cruelty statute by dragging it behind a truck resulting in removal of skin and pads on paws and exposure of nerve endings thereby impairing the paws' completeness and function over several weeks). This is not to say that every act of shooting an animal more than once is mutilation *per se*, but instead that given the circumstances of this case, the jury could reasonably conclude that the defendants' acts constituted mutilation in its plain and ordinary sense.

■ The defendants also claim that they presented uncontested evidence that they shot the cat to protect Mark's person and property and to prevent the cat from prolonged suffering. *See* I.C. § 35–46–3–12(b) (setting forth defenses to animal cruelty). This is simply an invitation to reweigh evidence and judge witness credibility, a task within the province of the jury. *See Lawson v. State*, 274 Ind. 419, 412

N.E.2d 759 (1980) (despite defendant's claim that his alibi evidence was un-rebutted by the State and corroborated by other witnesses, credibility of witnesses was a task for the jury), *cert. denied,* 452 U.S. 919, 101 S.Ct. 3057, 69 L.Ed.2d 424 (1981). We further note that the defendants make no claim that their actions fell within any of the exempt activities, such as statutorily authorized fishing, hunting, or trapping, listed in Ind.Code § 35–46–3–5 (Burns Code Ed. Repl.1998). In sum, the evidence is sufficient to support both defendants' convictions for Cruelty to an Animal.

The judgment of the trial court is affirmed.

DARDEN, J., concurs.

BAKER, J., dissents with opinion.

BAKER, Judge, dissenting.

The first time I went rabbit hunting—and the next to last—I was accompanied by an accomplished sportsman and family friend who was undoubtedly perturbed at how long I stalked my prey before discharging my shotgun in the direction of the poor wretch. As I was too close to the creature, we found little more of my quarry than the tail. Was that felony mutilation? I think not.

Although the majority opines that multiple shots will not necessarily constitute mutilation, it maintains that it possibly could. While I do not condone shooting cats, in this instance it was not otherwise illegal. The rapidity with which Chris and Mark dispatched the feline demonstrates that other than being either incompetent marksmen or intending to quickly destroy the pitiful animal, their acts were not such as prohibited by statute. Thus, I would

reverse their class A misdemeanor convictions for cruelty to an animal.